**Madalyn Murray O'HAIR and Jon Garth Murray, Appellants,**

v.

**Cecil ANDRUS, Secretary of the Interior, et al.**

**No. 79–2170.**

United States Court of Appeals, District of Columbia Circuit.

Oct. 5, 1979.

As Amended Nov. 14, 1979.

Joel D. Joseph and Jeffrey Hiller, Washington, D. C., for appellants.

R. Craig Lawrence, Asst. U. S. Atty., Washington, D. C., with whom Carl S. Rauh, U. S. Atty., John A. Terry and Royce C. Lamberth, Asst. U. S. Attys., Washington, D. C., were on the opposition to motion for injunction for appellees, Andrus, Secretary of Interior, et al.

Stephen A. Trimble, Washington, D. C., with whom John L. Hamilton, Washington, D. C., was on the opposition to motion for injunction for appellee, William Cardinal Baum.

Ralph J. Temple and John W. Karr, Washington, D. C., were on the pleadings for amicus curiae, American Civil Liberties Union, urging affirmance.

Walter Carson, Washington, D. C., was on the pleading for amicus curiae, Americans United Fund, urging affirmance.

Before LEVENTHAL, MacKINNON and WALD, Circuit Judges.

Opinion for the Court filed by Circuit Judge LEVENTHAL.

Concurring opinion filed by Circuit Judge MacKINNON.

LEVENTHAL, Circuit Judge:

Appellants-plaintiffs have moved for an injunction pending appeal, one that would restrain the celebration of the Mass by Pope John Paul II on the National Mall on Sunday, October 7, 1979. The Mall is Government property, a park area extending from the Lincoln Memorial to the Capitol Building in Washington, D. C. Alternatively, they seek an injunction until such time as the Roman Catholic Archdiocese of Washington guarantees that it will pay the United States for all funds expended in support of the activity on the Mall, including police protection, the construction and removal of fences and barriers, the provision of electricity and other utilities, and maintenance and trash removal. The district court denied appellants' request for injunction and dismissed their suit by an order entered on October 3. The motion in this court was filed October 4. We heard oral argument this morning, October 5. For the reasons stated below, we deny appellants' motion.

## I. BACKGROUND

On August 1, 1979, in accordance with its regulations,[1] the Department of the Interior issued a permit (Permit No. 79–583) to William Cardinal Baum, Archbishop of the Roman Catholic Archdiocese of Washington, authorizing a public gathering, sometime

---

1. 36 .C.F.R. § 50.19 (1978). The regulations under which the permit in question was issued are, in large measure, revisions made to comply with rulings of this court. *See A Quaker Action Group v. Morton,* 170 U.S.App.D.C. 124, 516 F.2d 717 (D.C.Cir.1975); *A Quaker Action Group v. Morton,* 148 U.S.App.D.C. 346, 460 F.2d 854 (D.C.Cir.1971); *A Quaker Action Group v. Hickel,* 139 U.S.App.D.C. 1, 429 F.2d 189 (D.C.Cir.1970); *A Quaker Action Group v. Hickel,* 137 U.S.App.D.C. 176, 421 F.2d 1111 (D.C.Cir.1969).

between October 4 and October 7, of an estimated 500,000 people at the National Mall, the Washington Monument grounds, the Ellipse, and the Lincoln Memorial green for the purpose of an outdoor Mass by His Holiness John Paul II.

The National Park Service has issued regulations that specifically govern applications for permits for the use of national parks for demonstrations, with "demonstrations" defined as including all "forms of conduct which involve the communication or expression of views . . . [having] the effect, intent or propensity to draw a crowd or onlookers."[2] The parties agree that the Interior Department treats all applications for demonstrations the same, be they religious or non-religious in nature.[3] They further agree that the application of the Archdiocese was treated in the same manner as any application for a permit projecting a similar turnout would have been treated.[4]

In connection with the outdoor Mass, the Interior Department, National Capital Region, is to provide Park Police services for crowd and traffic control, a chain link fence for crowd control, portable water fountains, and some electrical current.[5] The estimated cost of the Park Police service is between $100,000 and $150,000 and an estimated additional $28,450 will be required for the other services.[6] The type of expenses that will be incurred by the Interior Department are no different from those regularly incurred with any large public gathering,[7] and a comparable level of services and facilities would be extended by the Interior Department to any group of simi-

lar size which possesses a permit to use park land.[8] The District of Columbia will provide police service for crowd control involving approximately 200 to 225 officers. A comparable level of police protection would be extended in any situation involving a gathering of the size expected here.[9] In weekly sessions since August 1, representatives of the Interior Department and the Park Police have met with representatives of the Archdiocese to discuss logistics, and there have been numerous meetings with other government offices in anticipation of the large turnout. Similar meetings and preparation would be conducted for any group of similar size.[10]

In connection with the Mass, the Roman Catholic Archdiocese of Washington will expend in excess of $400,000. This will cover the construction of the platform, including the alter and other accouterments connected with the Mass. It will also cover the expense of fencing, sound equipment, electrical facilities (including supplemental electric current), portable toilets, first aid stations, chairs and other physical facilities.[11] The Archdiocese will also provide over 1,000 ushers and guides.[12] After the gathering, it will pay for the removal of all of the facilities constructed for the event and for the clean-up.[13] Moreover, the Archdiocese has agreed that, within the overall Mall area, attendance at the service will be open to members of the public regardless of religious preference or belief.[14]

Appellants-plaintiffs, Madalyn Murray O'Hair and Jon Garth Murray, avowed atheists, brought suit in the district court to

---

2. 36 C.F.R. § 50.19(d)(1) (1978). The regulations make separate provision for classes of activities distinct from "demonstrations," "special events" and "national celebration events." 36 C.F.R. § 50.19(a)(2) & (a)(3) (1978).

3. Stipulations of the Parties, Number 4.

4. *Id.*

5. Stipulations of the Parties, Number 8.

6. *Id.*

7. *Id.*

8. Stipulations of the Parties, Number 9.

9. Stipulations of the Parties, Numbers 10 and 11.

10. Stipulations of the Parties, Number 7.

11. Stipulations of the Parties, Number 15.

12. *Id.*

13. *Id.*

14. Stipulations of the Parties, Number 18.

enjoin the planned celebration of the Mass on the Mall. The defendants, now before us as appellees, include Secretary of the Interior Andrus, who issued the permit through his agent, and Cardinal Baum, the holder of the permit, who is represented for all pertinent purposes by his agent Bishop Thomas W. Lyons.

By an Order dated October 3, the district court denied the injunction and granted the defendants' motion to dismiss the complaint. Judge Gasch's Memorandum emphasized that "the Department of the Interior is extending to the Archdiocese no greater access, uses, facilities, privileges, or support than would be extended to any other group, religious or non-religious." [15]

## II. ANALYSIS

This case involves several interrelated First Amendment interests. The amendment protects freedom of speech and expression of view. It protects the free exercise of religion. And it insures freedom of religious worship by prohibiting the government from any "establishment of religion."

This case also involves a special kind of government property. Parkland has an historic identification in the Anglo-American tradition for communication among citizens. In *Hague v. CIO*, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed.2d 1423 (1939) the Court declared, in an opinion by Justice Roberts:

> Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thought between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens.

This doctrine was quoted and followed in *Kunz v. New York*, 340 U.S. 290, 293, 71 S.Ct. 312, 314, 95 L.Ed. 280 (1951), where the Court, in an opinion by Chief Justice Vinson, held it applicable to the use of these public places "for the expression of religious views" and the holding of religious meetings.[16] These principles have been held by this court to have full vitality for application to the national parks within the District of Columbia. In *Quaker Action Group v. Morton*, 137 U.S.App.D.C. 176, 516 F.2d 717 (1970), we declared that the time-honored use of parks embraced "[p]ublic assembly for First Amendment purposes," with the use of parkland subject to reasonable regulation as to time, place and manner, and to the requirement that the parks be made available for groups without discrimination on the basis of content of expression.[17]

In its current regulations, the National Park Service has implemented the foregoing decisions. The Department of the Interior alleges, and the appellants concede, that the regulations at issue both read and are applied in a non-discriminatory manner. Religious and non-religious groups and events are treated alike. No "preference" is present. This undercuts appellants' establishment claim. When the National Mall is, as a matter of established policy, openly available on a non-discriminatory basis to the Pope, to the Reverend Moon,[18] to Madalyn Murray O'Hair, and to *all* others (religionists and anti-religionists), there is no "establishment of a religion," and there cannot be a meaningful perception of one. The file before the court contains a statement by the National Park Service that it issues about 100 permits annually for religious activities on national park land within the District of Columbia. A central aspect of our pluralist society is its religious

---

15. The court relied on *Allen v. Morton*, 161 U.S.App.D.C. 239, 495 F.2d 65 (1973).

16. *See generally*, L. Tribe, American Constitutional Law § 12–21 (1978).

17. *See also Women Strike for Peace v. Hickel*, 137 U.S.App.D.C. 29, 420 F.2d 597 (1969).

18. At oral argument it was established that the Reverend Moon was one of the many religious

diversity.[19] This pluralism reflects the very purpose of the Establishment Clause. And this pluralism is nurtured by the precept of equal access to a public facility generally open to the public.

To the Framers, the Establishment Clause and the Free Exercise Clause were supplemental and compatible means to the realization of the goal of religious freedom. Despite this intended harmony, "serious tension has often surfaced between the two clauses."[20] The Supreme Court has held that the Free Exercise Clause itself compels government to make *some* accommodation to religious realities and needs.[21] So long as government aid goes no further than arguably required by this principle, there is no violation of the separation required by the Establishment Clause.[22] Theoretically, any government aid indirectly frees religious resources to be put to sacred ends. The Court has recognized, however, that prohibiting all assistance would mean that "a church could not be protected by the police and fire departments, or have its public sidewalk kept in repair." *Roemer v. Board of Public Works*, 426 U.S. 736, 747, 96 S.Ct. 2337, 2345, 49 L.Ed.2d 179 (1976). That, of course, is not the law.

The Supreme Court's application of these principles lights our path. *Everson v. Board of Education*, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), upheld a publicly funded program of busing when extended to all school-age children, including those in parochial schools. Similarly, the government can expend tax revenues to provide for the safety, security, and general convenience for all its citizens, including the multitudes likely to attend the Mass on October 7. The Department of the Interior may furnish police protection, sanitation, lighting, and other basic public facilities.

■ The regulations at issue are neutral on their face, and the appellants concede that they are applied alike to religious and non-religious activity. The government may not allocate access to a public place available for communication among citizens on the basis of the religious content of the messages.[23] In *Fowler v. State of Rhode Island*, 345 U.S. 67, 73 S.Ct. 526, 97 L.Ed. 828 (1953), where the Court considered the use of a public park in Pawtucket for religious exercises, it insisted only that it be equally available to all religious groups[24] —and equal availability is exactly the policy in the instant case. In *Fowler*, Justice Frankfurter concurred separately, on the ground that a discriminatory application violated the equal protection clause, expressly disassociating himself from First Amend-

---

spokesmen, of various denominations, who had obtained a permit for services at the Mall.

**19.** For example, in 1960 there existed "more than 400 more or less definitely organized bodies . . . [not including] the multitude of storefront churches, local sects, cults, and unclassifiable quasi-religious associations which operate ephemerally but often vigorously in the American scene." Jamison, *Religions on the Christian Perimeter*, in I Religion in American Life 162 (J. Smith & A. Jamison eds. 1961). The listed groups, as of 1961, ranged in size from the 35-million member Roman Catholic Church to the Church of Christ (Cutler) with a single congregation of 16 members.

**20.** L. Tribe, American Constitutional Law § 14–2 (1978).

**21.** *See, e. g., Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963).

**22.** L. Tribe, American Constitutional Law, §§ 14–4, 14–10 (1978).

**23.** *See, e. g., Murdock v. Pennsylvania*, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1953); *Cantwell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

**24.** 345 U.S. at 70, 73 S.Ct. 526. *See also Poulos v. State of New Hampshire*, 345 U.S. 395, 73 S.Ct. 1760, 97 L.Ed. 1105 (1953), *Tucker v. State of Texas*, 326 U.S. 517, 66 S.Ct. 274, 90 L.Ed. 274 (1946), *Niemotko v. Maryland*, 340 U.S. 268, 71 S.Ct. 325, 95 L.Ed. 267 (1951), *Kunz v. People of New York*, 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280 (1951), *Saia v. People of New York*, 334 U.S. 558, 68 S.Ct. 1148, 92 L.Ed. 1574 (1958). See also *Police Department of Chicago v. Mosley*, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972), which held that the First Amendment, and not merely the equal protection clause, required access for all views, and which relied both on cases involving religious activity, notably *Niemotko* and *Fowler*, cases involving political views, pulling together those strands of expression. *Id.* at 96, 92 S.Ct. 2286.

ment references in the majority opinion (of seven justices). This underscores the majority's conception that First Amendment values were involved in the religious exercises in the park. The Court summarized its approach as follows:

> t is no business of courts to say that what is a religious practice or activity for one group is not religion under the protection of the First Amendment. Nor is it in the competence of courts under our constitutional scheme to approve, disapprove, classify, regulate, or in any manner control sermons delivered at religious meetings. Sermons are as much a part of a religious service as prayers. They cover a wide range and have as great a diversity as the Bible or other Holy Book from which they commonly take their texts.

Appellants conceded at trial and at oral argument that the Pope could be issued a permit to deliver a sermon, arguing that it is the unique religious nature of the Mass that sets it apart. This contention runs counter to the principles of the First Amendment by hopelessly entangling the government with religion. Such a distinction would involve the government in the task of defining what was religious and what was non-religious speech or activity— an impossible task in an age where many and various beliefs meet the constitutional definition of religion.[25] The administration of such a test would impermissibly entangle government and religion.

Appellants say that the government permit for this occurrence on the renowned National Mall sends an implied message—to the nation and to the world—of government approval (and therefore "establishment") of this church service. It implies no more approval for this church than for any other group using the Mall. The message that it does send to the world is approval of the principle of freedom of demonstration, for all groups, for all religions, even for those opposing religion.

Plaintiffs conjecture that any ruling permitting this use opens the door to conversion of the Mall into an outdoors church. The law has the ability of preventing sound doctrine from being pushed to unsound extremes. These regulations have provisions to guard against excessive use and appropriation of the parkland by any group, and to ensure against preclusion of others.[26] If those provisions prove ineffective, the courts can provide rulings on the basis of the questions that arise in the light of concrete factual showings.

Appellants' reliance on cases treating elementary and secondary schools is inappropriate. Because of their central and delicate role in American life, and because of the unique susceptibility of their captive audience, children, to coercion, the public schools have a special insulation from religious ceremony. Different considerations apply to colleges and universities, where the likelihood of coercion is less,[27] and to other forums where free exercise values demand accommodation of religious belief.

A final point raised by appellants stresses their position as taxpayers and cites the large expenditures required of the government on this occasion. In this case the Church itself is providing for expenses in substantial measure, covering any possible incremental sums ascribable to the Mass as a religious worship, including the building of the platform for the altar. There remains a large outlay required of the government by the very convocation of a crowd of this size. But it is an important function of government to permit such large assemblies in outdoor parks by our citizens. Provision of police, sanitation and related public services is a legitimate function of government and not an "establishment" of religion.

In any attempt to reconcile the religion clauses of the First Amendment a principle

**25.** *See* L. Tribe, American Constitutional Law § 14–6 (1978); *see also* Note, Toward a Constitutional Definition of Religion, 91 Harv.L.Rev. 1056, 1068–72 (1978).

**26.** 36 C.F.R. § 50.19(e)(5) (1978).

**27.** *See, e. g., Roemer v. Board of Public Works of Maryland*, 426 U.S. 736, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976).

of accommodation prevails; neutrality must not be confused with hostility. As Justice Brennan put it, concurring in *Abington School District v. Schempp*, 374 U.S. 203, 299, 83 S.Ct. 1560, 1612, 10 L.Ed.2d 844 (1963):

> [H]ostility, not neutrality, would characterize the refusal to provide chaplains and places of worship for prisoners and soldiers cut off by the State from all civilian opportunities for public communion, the withholding of draft exemptions for ministers and conscientious objectors, or the denial of the temporary use of an empty public building to a congregation whose place of worship has been destroyed by fire or flood.

■ This principle that some use of public property for a religious service may occur without constituting an "establishment" of religion is not confined to emergencies. The Naval Academy can properly provide a chapel for voluntary religious worship, notwithstanding the accessibility of Annapolis and its churches.[28] The legitimacy of nondiscriminatory, voluntary religious exercises in parks is plain from *Fowler*.

### III. CONCLUSION

The National Mall is a public park that has regularly been made available to all major demonstrations presenting First Amendment values. That is the non-discriminatory policy of the government, evolved in accordance with rulings of this court.[29] The government has applied this policy not only to purely secular uses, but for uses by religious groups. The principles of the First Amendment support such neutral use of a public park. *Fowler v. Rhode*

*Island, supra.* To strike down a regulation rooted in neutrality so as to deny access to the Pope for a mass-cum-sermon would thwart First Amendment values underlying communication and religious freedom.[30] The Establishment Clause is not an abstraction in logic. It permits an accommodation in furtherance of the spirit and purpose of the First Amendment. The motion for an injunction pending appeal is denied.

*So ordered.*

MacKINNON, Circuit Judge (concurring):

The National Park Service on August 1st issued a Public Gathering Permit to the Roman Catholic Archdiocese of Washington to hold an outdoor mass by his Holiness John Paul II between October 4—October 7, 1979 at the following locations: National Mall, Washington Monument, Ellipse, Lincoln Memorial green, United States Capitol grounds. The permit was issued in accordance with National Park regulations set forth in CFR Title 36, Chapter I, Section 50.9 and was granted subject to certain customary conditions that the National Park Service imposes on such public gatherings. These include the condition that "no fee may be collected, donations solicited . . . ." and that articles involving commercial activity may not be "offered for sale".

Appellants complaint against the appellees seeks to enjoin the gathering authorized by said permit on the ground that said gathering would violate the First Amendment and invade appellants' rights guaranteed by the United States Constitution. The First Amendment provides:

> "If the non-government sponsors wish to retain the creche, the Government could avoid all Establishment issues by severing its connection with the Pageant and merely treating it like any other applicant for use of parkland."

28. *See Anderson v. Laird*, 151 U.S.App.D.C. 112, 466 F.2d 283 (D.C.Cir.1972). The rulings upholding military chaplains "justify any other aid involved in making Sunday chapel available on a voluntary basis." (Leventhal, J.). The opinion of Judge MacKinnon would have sanctioned aid where chapel was on a compulsory basis.

29. See, in addition to the *Quaker Action* rulings, *supra*, note 1, the decision in *Allen v. Morton*, 161 U.S.App.D.C. 239, 495 F.2d 65 (1973). See particularly, 161 U.S.App.D.C. at 264, 495 F.2d at 90 (Leventhal, J., concurring):

30. *McDaniel v. Paty*, 435 U.S. 618, 98 S.Ct. 1322, 55 L.Ed.2d 593 (1978) (declaring unconstitutional a provision in the Tennessee constitution barring clergy from lawmaking posts).

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

Our immediate concern is the motion by appellants for an injunction pending appeal in support of which they have filed a statement of points and authorities.

Their initial contention is that the use of Government funds to support the activity authorized by the permit which "involves" strictly religious ceremonies constitutes an establishment of religion in violation of the First Amendment. In this connection it is appellants' principal contention that the First Amendment provisions will be violated by the Government's providing "a chain link fence for crowd control, portable water fountains, electrical current, park police services for crowd control and traffic control." The estimated cost of the park police is set at $100,000 to $150,000; the chain link fence including construction and removal at $13,450; the cost of park rangers and park maintenance crews, including electricians and plumbers at approximately $15,000, for a total of $128,450 to $178,450.

The items involved in this expenditure divide themselves into crowd control and the electrical current for loud speakers used to broadcast the service to the crowd. The Government heretofore has paid the costs of crowd control and furnished electricity for large gatherings on the Mall. Within our memory this would include Resurrection City, The Moratorium, The Farm Tractors Protest, etc. Thus there is nothing to indicate that the payment by the Government of such expenditures in this instance would indicate any approval of the religious ceremony any more than the Government's permit and expenditures for such purposes at the so-called, Moratorium Gathering, which sought to "shut down the Government", indicated any approval of that activity. This argument of appellants is thus rejected.

Appellants also contend that if the religious mass is performed on October 7, 1979 we could have a religious service every Sunday thereafter and the Mall would become a Church. However, the record indicates that the Government on widely separated occasions has been allowing the use of the Mall for special events and regular use is restricted by the regulations. To attempt to convert this irregular practice into a regular practice would be in contradiction of the regulations and the basis upon which prior permits have been issued in these matters. Therefore, it cannot be concluded that because permits are issued for widely separated special events the Government would thereby be forced to issue permits for such activities on a regular basis. In other words, authorizing special events of a religious nature on widely separated occasions is one thing so far as the establishment clause is concerned and to do so on a regular basis is another thing. In my view the permit in question issued for this special occasion does not constitute a violation of the establishment clause and does not tend to establish that the Government must do so on a regular basis.

In coming to the foregoing conclusion, I find that in issuing this permit the Government cannot be interpreted as giving its stamp of approval to the spiritual content of any sermon or declaration that may be made on the occasion. *Allen v. Hickel*, 138 U.S.App.D.C. 31, 424 F.2d 944 (D.C.Cir. 1970). I thus do not conclude as appellants argue that "the Government's permitting a religious service to take place on Government property . . . will be demonstrating to the world that the United States Government will approve the spiritual content of the Pope's mass." Rather, it appears to me that the Government by permitting the religious service to take place on Government property will be demonstrating to the world that the United States Government supports the free exercise of religion. As Justice Douglas remarked in *Zorach v. Clauson*, 343 U.S. 306, 313–14, 72 S.Ct. 679, 96 L.Ed. 954 (1952);

We are a religious people whose institutions presuppose a Supreme Being.

We guarantee the freedom to worship as one chooses. We make room for as wide a variety of beliefs and creeds as the spiritual needs of man deem necessary. We sponsor an attitude on the part of government that shows no partiality to any one group and that lets each flourish according to the zeal of its adherents and the appeal of its dogma. When the state encourages religious instruction or cooperates with religious authorities by adjusting the schedule of public events to sectarian needs, it follows the best of our traditions. For it then respects the religious nature of our people and accommodates the public service to their spiritual needs. To hold that it may not would be to find in the Constitution a requirement that the government show a callous indifference to religious groups. That would be preferring those who believe in no religion over those who do believe. Government may not finance religious groups nor undertake religious instruction nor blend secular and sectarian education nor use secular institutions to force one or some religion on any person. But we find no constitutional requirement which makes it necessary for government to be hostile to religion and to throw its weight against efforts to widen the effective scope of religious influence. The Government must be neutral when it comes to competition between sects. It may not thrust any sect on any person. It may not make a religious observance compulsory. It may not coerce anyone to attend church, to observe a religious holiday, or to take religious instruction.

It should also be noted that this nation permits Congress and every state legislative body to be opened by prayer of a Chaplain of various religious faiths. In the Armed Services, in all locations in the country and throughout the world, Chaplains of all religions are permitted to give sermons on property under Government control or ownership. Furthermore, apart from the size of the crowd and so far as the Constitutional question is concerned, the Government is doing nothing more here than every city of moderate size in the United States does

when it permits the Salvation Army to hold public services on street corners and preach Christianity to all who will stand to listen.

In my view, appellants have no likelihood of prevailing on the merits and I thus voted to deny the injunction pending appeal.

I concur in Judge LEVENTHAL'S opinion.