635 F.2d 1310
 Florian Frederick CHESS, Dale Rhoton, Ronald Barnes, Glenn
P. Garrison, Kathleen Anne Aguirre, Douglas Neef, Clark
Vincent, James S. Colmer, Jr., Dawn B. Wallace, Jonathan
Williams, Malinda Ann McMurray and Katherine Cyman, Appellants,
v.
Gary E. WIDMAR, The Board of Curators of the University of
Missouri, Barbara Berkmeyer, Daniel L. Brenner, Robert A.
Dempster, William T. Doak, C. R. Johnston, Marian Oldham,
Wallace R. Stacey, M. D., Rex Z. Williams and Van O.
Williams, Appellees.
 No. 80-1048.
 United States Court of Appeals,
Eighth Circuit.
 Submitted May 21, 1980.
Decided Aug. 4, 1980.
Rehearing En Banc Denied Sept. 19, 1980.
Certiorari Granted Feb. 23, 1981.
See 101 S.Ct. 1345.
 
 James M. Smart, Jr., Smart & Whitehead, Kansas City, Mo., argued, for appellants; William H. Pickett, Kansas City, Mo., on brief.
 Ted D. Ayres, Columbia, Mo., argued, for appellees; Jackson A. Wright, James S. Newberry and Robert L. Ross, Columbia, Mo., on brief.
 Charles A. Blackmar and Jane E. Nelson, Kansas City, Mo., for amicus curiae, Bible Study, et al.
 Barry A. Fisher, David Grosz and Larry J. Roberts, Los Angeles, Cal., for amicus curiae, Holy Spirit Assoc., et al.
 Before GIBSON, Senior Circuit Judge, and HEANEY and STEPHENSON, Circuit Judges.
 HEANEY, Circuit Judge.
 
 
 1
 This appeal presents the question of whether the University of Missouri-Kansas City, which permits recognized student organizations to use the student center, certain other buildings and the grounds of the University for political, cultural, educational, social and recreational events, may prohibit a recognized student group from using these same facilities for religious worship services or teaching. We hold it may not.
 
 
 2
 * BACKGROUND
 
 
 3
 With the goal of making student free-time activity a cooperative aid to academic study,[1] the University of Missouri-Kansas City (UMKC) encourages the formation of student organizations, boards and committees. The University officially recognizes over ninety student organizations. The University's past and present policy is to permit recognized student groups to use the student center and certain other UMKC facilities for their lectures, discussions, symposiums, meetings, events and programs. Each student is required to pay a student activity fee of $41.00 per semester (1978-1979) to help defray the costs of these activities.
 
 
 4
 Appellant Cornerstone is, and for at least four years has been, an officially recognized student organization on the UMKC campus. It has a nucleus of about twenty active students and its on-campus meetings and events have been attended by up to 125 people.
 
 
 5
 From 1973 until 1977, Cornerstone sought and obtained permission to use University facilities for its weekly meetings and events. In 1977, however, this practice was terminated by the University on the ground that Cornerstone's meetings violated regulations adopted by the Board of Curators in 1972. The full text of these regulations, which prohibit the use of University buildings or grounds for purposes of religious worship or religious teaching, is as follows:
 
 
 6
 4.0314.0107 No University buildings or grounds (except chapels as herein provided) may be used for purposes of religious worship or religious teaching by either student or nonstudent groups. Student congregations of local churches or of recognized denominations or sects, although not technically recognized campus groups, may use the facilities, commonly referred to as the student union or center or commons under the same regulations that apply to recognized campus organizations, provided that no University facilities may be used for purposes of religious worship or religious teaching. The general prohibition against use of University buildings and grounds for religious worship or religious teaching is a policy required, in the opinion of The Board of Curators, by the Constitution and laws of the State and is not open to any other construction. No regulations shall be interpreted to forbid the offering of prayer or other appropriate recognition of religion at public functions held in University facilities. This provision does apply to such buildings as may be designated under provision of part .0106.
 
 
 7
 4.0314.0108 Regular chapels established on University grounds may be used for religious services but not for regular recurring services of any groups. Special rules and procedures shall be established for each such chapel by the Chancellor. It is specifically directed that no advantage shall be given to any religious group. ([2]
 
 
 8
 The University's enforcement of this regulation began with Cornerstone's January 5, 1977, request to continue its use of a particular lecture hall for Saturday night meetings during the spring term. On the University's request form, Cornerstone stated that its purpose was to "promote a knowledge of Jesus Christ among students" and listed the subject of the proposed meetings to be "various topics relating to Christianity and the Bible." The request stated that the meetings and events would be open to the public, no University funds would be used, no admission would be charged and no donations would be solicited. The Dean of Students met with Cornerstone representatives and requested more information regarding the nature and purpose of their meetings. In response, Cornerstone's attorney submitted a letter containing this direct and candid description:
 
 
 9
 Typical Cornerstone meetings in University facilities usually include the following:
 
 
 10
 1. The offering of prayer;
 
 
 11
 2. The singing of hymns in praise and thanksgiving;
 
 
 12
 3. The public reading of scripture;
 
 
 13
 4. The sharing of personal views and experiences (in relation to God) by various persons;
 
 
 14
 5. An exposition of, and commentary on, passages of the Bible by one or more persons for the purpose of teaching practical biblical principles; and
 
 
 15
 6. An invitation to the interested to meet for a personal discussion.
 
 
 16
 As you probably already know, these meetings are open to the public. Any students, be they Jewish, Christian, Moslem, or any other persuasion are invited, and, in fact, actively recruited by the students in Cornerstone.
 
 
 17
 Although these meetings would not appear to a casual observer to correspond precisely to a traditional worship service, there is no doubt that worship is an important part of the general atmosphere. There also is no doubt that the undecided and the uncommitted are encouraged and challenged to make a personal decision in favor of trusting in Jesus Christ both for salvation and for the power to live an abundant Christian life on earth.
 
 
 18
 There are no collections or solicitations of funds at these meetings, and there are no specific rituals or practices of any particular denomination or sect.
 
 
 19
 Relying on this letter, the University concluded that Cornerstone's meetings would violate its regulations and denied the application on February 4, 1977. The University later refused the group's request to hold small group Bible studies on the University lawn.
 
 
 20
 In response to these refusals, eleven student members of Cornerstone initiated this action in federal district court, alleging that the University had violated their rights under both the federal and state constitutions. They claimed, inter alia, that the University had deprived them of their rights to free exercise of their religion, freedom of speech and equal protection of the law. Named as defendants were the University's Board of Curators and the Dean of Students. At a pretrial conference, the parties agreed that the case could be submitted on stipulated facts. After the stipulation was filed, cross-motions for summary judgment were made.
 
 
 21
 On December 11, 1979, the district court granted the defendants' motion and denied the plaintiffs'. It characterized the issue as "whether the university's ban on religious activities in university-owned buildings is required by the establishment clause of the first amendment." Chess v. Widmar, 480 F.Supp. 907, 914 (W.D. Mo. 1979). Using the familiar establishment clause analysis,[3] the district court determined that a neutral policy accommodating all student groups in their use of the University's facilities would clearly reflect a secular legislative purpose and would avoid excessive entanglement with religion. But, analogizing the facts before it to those faced by the Supreme Court in Tilton v. Richardson, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971), the court found that "a university policy permitting regular religious services in university-owned buildings would have the primary effect of advancing religion." Chess v. Widmar, supra, 480 F.Supp. at 915-916. It concluded "that the university's present ban on religious services in its buildings is required by the establishment clause." Id. at 916 (emphasis added).
 
 
 22
 Notwithstanding this conclusion, the court then considered whether this ban ran afoul of rights guaranteed by other clauses, particularly the Free Exercise Clause. Initially, it found that no free exercise right was violated since it did not appear that the " 'practice' of holding religious services in a university-owned building is a matter of deep religious conviction to (these) plaintiffs." Id. at 917. Second, it concluded that the infringement, if any, of plaintiffs' free exercise rights was justified by a compelling state interest Missouri's "long history of strict separation of church and state." Id. Finally, the court dismissed the argument that the Free Exercise Clause prevails if the Establishment and Free Exercise Clauses conflict, finding that the conflict is illusory because the two clauses are aimed at separate evils. Id. at 917-918.
 
 
 23
 The plaintiffs also argued that the University's regulations act as a prior restraint on their free speech rights. Characterizing this as an argument that the Establishment Clause is subordinate to the Free Speech Clause, the court rejected it, commenting that "speech with religious content cannot be treated the same as any other form of speech." Id. at 918. Citing to Abington School District v. Schempp, 374 U.S. 203, 219, 83 S.Ct. 1560, 1569, 10 L.Ed.2d 844 (1963) (quoting Mr. Justice Rutledge's dissent in Everson v. Board of Education, 330 U.S. 1, 63, 67 S.Ct. 504, 534, 91 L.Ed. 711 (1947)), the district court suggested that "secular intellectual liberties" were entitled to a higher degree of protection than "religious activity." Chess v. Widmar, supra, 480 F.Supp. at 918.
 
 
 24
 The court next rejected the plaintiffs' argument that the University had denied them equal protection of the laws. It distinguished Fowler v. Rhode Island, 345 U.S. 67, 73 S.Ct. 526, 97 L.Ed. 828 (1953), on two grounds: First, unlike the situation in Fowler, in this case there is no discrimination among, as opposed to against, religious groups. Second, in this case, public buildings, as distinguished from a public park, are involved. Chess v. Widmar, supra, 480 F.Supp. at 919. The court acknowledged that "if the university's regulations were being applied to prohibit plaintiffs from conducting religious services on the grounds, side walks, or streets of the university, plaintiffs' equal protection argument would have some force," id., but it did not discuss the stipulated fact that the University refused to permit Cornerstone to hold Bible studies on the University's lawn. It omitted this incident from its analysis on the grounds that the complaint challenged "only the denial of the use of university-owned buildings." Id. (emphasis added).[4]
 
 
 25
 Finally, the court rejected plaintiffs' contention that the University's regulations were unconstitutionally vague and overbroad since the regulations' language closely tracked that approved in Tilton. Id. at 919-920.
 
 II
 ANALYSIS
 
 26
 We begin with the proposition that religious speech, like other speech, is protected by the First Amendment.[5] See Fowler v. Rhode Island, supra; Murdock v. Pennsylvania, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943). Similarly, the freedom to associate for the advancement of religious beliefs is no less protected than the freedom to associate for the advancement of beliefs that are political, economic or cultural in nature.
 
 
 27
 Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association, as this Court has more than once recognized by remarking upon the close nexus between the freedoms of speech and assembly. It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the "liberty" assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech. Of course, it is immaterial whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters, and state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny.
 
 
 28
 NAACP v. Alabama, 357 U.S. 449, 460-461, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488 (1958) (emphasis added and citations omitted).
 
 
 29
 It is also fundamental that equal access to a public forum cannot be restricted because of the content of the message.
 
 
 30
 (U)nder the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views. And it may not select which issues are worth discussing or debating in public facilities. There is an "equality of status in the field of ideas," and government must afford all points of view an equal opportunity to be heard. Once a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say. Selective exclusions from a public forum may not be based on content alone, and may not be justified by reference to content alone.
 
 
 31
 Carey v. Brown, 447 U.S. 455, 463, 100 S.Ct. 2286, 2291, 65 L.Ed.2d 263 (1980) (quoting Police Dept. v. Mosley, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972) (footnote omitted)); see Fowler v. Rhode Island, supra; Niemotko v. Maryland, 340 U.S. 268, 71 S.Ct. 325, 95 L.Ed. 267 (1951).
 
 
 32
 The principles stated freedom of religious expression and equal access to a public forum are significant here. The University has undertaken to aid in the growth and development of the "social and cultural awareness" of its students by recognizing their self-directed activities and by permitting authorized groups to use the student center and other of its facilities for meetings, discussions, symposiums, programs and events. It has created an open forum for the activities of its recognized student groups. It has placed only one limitation on those activities: no religious worship or religious teaching may take place.
 
 
 33
 If the University's limitation applied to all religious speech, it would clearly be invalid. Absent a compelling state interest, the University does not have the right to deny a recognized student group access to its facilities solely on the basis of the content of the group's speech. See Healy v. James, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972); Gay Lib v. University of Missouri, 558 F.2d 848 (8th Cir. 1977), cert. denied, 434 U.S. 1080, 98 S.Ct. 1276, 55 L.Ed.2d 789 (1978); Keegan v. University of Delaware, 349 A.2d 14 (Del. 1975), cert. denied, 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 342 (1976).[6] The University concedes as much. It contends, however, that its limited regulation permitting some religious speech, but prohibiting religious worship or religious teaching in its buildings or on its grounds, is constitutionally required to avoid an establishment of religion.[7] The district court accepted the University's argument. We cannot.
 
 
 34
 A framework for analyzing Establishment Clause problems was articulated in Lemon v. Kurtzman, 403 U.S. 602, 612-613, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971) (quoting Walz v. Tax Commission, 397 U.S. 664, 674, 90 S.Ct. 1409, 1414, 25 L.Ed.2d 699 (1970)), as follows:
 
 
 35
 First, the (governmental regulation) must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion * * * ; finally, the (regulation) must not foster "an excessive governmental entanglement with religion." (Emphasis added.)
 
 
 36
 The district court, in applying this analysis, recognized that "A (neutral) university policy that permitted any student group to meet in university-owned buildings for any purpose would aid all student groups, regardless of religious affiliation and would, therefore, reflect a clear secular purpose. In addition, since such a policy would make no distinction between groups or their purposes, entanglement with religion would be completely avoided." Chess v. Widmar, supra, 480 F.Supp. at 914 (emphasis in original). It went on to hold, however, that a neutral policy would be impermissible because it would have the primary effect of advancing religion. Accord, Dittman v. Western Washington University, No. C79-1189V, slip op. at 4-5 (W.D. Wash., Feb. 27, 1980), appeal docketed No. 80-3120 (9th Cir., Apr. 7, 1980).
 
 
 37
 We agree with the district court that a neutral policy would have a secular purpose and would avoid an entanglement with religion. We cannot agree, however, that such a policy would have the primary effect of advancing religion. Rather, it would have the primary effect of advancing the University's admittedly secular purpose to develop students' "social and cultural awareness as well as (their) intellectual curiosity." It would simply permit students to put their religious ideas and practices in competition with the ideas and practices of other groups, religious or secular. It would no more commit the University, its administration or its faculty to religious goals than they are now committed to the goals of the Students for a Democratic Society, the Young Socialist Alliance, the Young Democrats or the Women's Union.
 
 
 38
 Furthermore, a neutral policy would not be an "establishment" as that term was understood by the framers of the First Amendment. "(F)or the men who wrote the Religion Clauses * * * the 'establishment' of a religion connoted sponsorship, financial support, and active involvement of the sovereign in religious activity." Walz v. Tax Commission, supra, 397 U.S. at 668, 90 S.Ct. at 1411. Under a neutral policy, the University would not sponsor religious worship or teaching; sponsorship would lie with the recognized student groups. Financial support would be minimal. Finally, there would be no active involvement of the sovereign because the University's role would be limited to determining the time, place and manner of the event and would not extend to approval or disapproval of content.[8]
 
 
 39
 In contrast with a neutral policy, UMKC's current regulation has the primary effect of inhibiting religion, an effect which violates the Establishment Clause just as does governmental advancement of religion. Lemon v. Kurtzman, supra, 403 U.S. at 612-613, 91 S.Ct. at 2111. The University's policy singles out and stigmatizes certain religious activity and, in consequence, discredits religious groups.[9]
 
 
 40
 The University's prohibition on worship and religious teaching also hopelessly entangles it in the delicate tasks of defining religion, determining whether a proposed event involves religious worship or teaching, and then monitoring events to ensure that no prohibited activity takes place. These would be particularly difficult tasks in our contemporary society.[10]
 
 
 41
 The fine line between impermissible governmental aid to religion and the neutral accommodation of religious groups' First Amendment rights was illuminated by Judge Leventhal's scholarly opinion in O'Hair v. Andrus, 613 F.2d 931 (D.C. Cir. 1979). In that case, the Court considered a challenge to the scheduled use of the National Mall for the celebration of Mass by Pope John Paul II. Although it was estimated that the Department of Interior would incur expenses in excess of $128,450 for services rendered during the Mass, no impermissible aid to religion was found. Noting that the Free Exercise Clause "compels government to make some accommodation to religious realities and needs," it found that "equal access to a public facility generally open to the public," was such an accommodation. Id. at 935 (emphasis in original, footnote deleted). It then concluded that "(s)o long as government aid goes no further than arguably required by (the accommodation) principle, there is no violation of the separation required by the Establishment Clause." Id. (footnote deleted). See also Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963).
 
 
 42
 The University urges us to distinguish O'Hair on the ground that a public building rather than a park is involved. We cannot do so. We note initially that the University prohibited Cornerstone from meeting both in its buildings and on its grounds. The grounds of a university, no less than the parks of a town, have historically been used by students for the purposes of assembly and communication. Recognizing this, the district court noted that Cornerstone's equal protection argument would have some force if the group was prohibited "from conducting religious services on the grounds, side walks, or streets of the university * * *." Chess v. Widmar, supra, 480 F.Supp. at 919. It did not, however, apply this conclusion to the stipulated fact that Cornerstone was denied access to the University grounds. See p. 1314 & note 3, supra. When this fact is considered, O'Hair's relevance is clear.
 
 
 43
 Moreover, even if UMKC's regulation prohibited only use of public buildings, O'Hair is still applicable. The important question is not the character of the property but the character of its use; the National Mall and other parkland has acquired its status as an open forum by tradition, the facilities that UMKC offers to its student groups have attained that status through operation of its Student Activities Program. Just as a sidewalk or a park may not be made available for some type of speech but not others, see Police Dept. v. Mosley, supra; O'Hair v. Andrus, supra, so, too, UMKC's facilities may not be made available to all student groups except those seeking to engage in religious worship or teaching.
 
 
 44
 We further note that a university, like parkland, connotes special First Amendment values. For millions of people, the university is their first and perhaps most important exposure to the free and open marketplace of ideas which is at the core of our First Amendment rights. See Healy v. James, supra, 408 U.S. at 180-181, 92 S.Ct. at 2345-2346. In his classic essay, "The Idea of a University," John Henry Newman described the institution as a place
 
 
 45
 in which the intellect may safely range and speculate, sure to find its equal in some antagonist activity, and its judge in the tribunal of truth. It is a place where inquiry is pushed forward, and discoveries verified and perfected, and rashness rendered innocuous, and error exposed, by the collision of mind with mind, and knowledge with knowledge.
 
 
 46
 Newman, The Idea of a University, in 28 The Harvard Classics 31, 39 (1910).
 
 
 47
 To attempt to insulate religious issues from this "collision of mind with mind, and knowledge with knowledge" is to deny the importance of religion in our history and culture and to deprecate the role of the university community in the maturation of youth.
 
 
 48
 The University also suggests that O'Hair is distinguishable because it involved a single use, not the regularly recurring use sought by Cornerstone. See O'Hair v. Andrus, supra, 613 F.2d at 936 (MacKinnon, J., concurring). The University's regulation, however, clearly prohibits any use, single or recurring.
 
 
 49
 The district court found, and the University asserts on appeal, that this case is controlled by Tilton v. Richardson, supra, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790. In Tilton, the Court upheld aid in the form of federal grants for the construction of academic facilities at private universities. Some of these universities were church-related. The legislation included a restriction that the buildings not be used for "sectarian instruction or as a place for religious worship * * *." Id. at 675, 91 S.Ct. at 2094. The aid was upheld because its purpose was secular and its primary effect was not the advancement of religion.
 
 
 50
 The Court did, however, strike that portion of the legislation that terminated after twenty years the restriction on religious use of the facilities.
 
 
 51
 Limiting the prohibition for religious use of the structure to 20 years obviously opens the facility to use for any purpose at the end of that period. It cannot be assumed that a substantial structure has no value after that period and hence the unrestricted use of a valuable property is in effect a contribution of some value to a religious body. Congress did not base the 20-year provision on any contrary conclusion. If, at the end of 20 years, the building is, for example, converted into a chapel or otherwise used to promote religious interests, the original federal grant will in part have the effect of advancing religion.
 
 
 52
 Id. at 683, 91 S.Ct. at 2098.
 
 
 53
 The concern of the Court in Tilton was with the potential that a sectarian college would be granted exclusive control of a government-financed building on its campus and could devote that building to its own religious purposes. Here, however, there is no question that UMKC continues to control its buildings and devotes them to secular purposes. There is no Tilton problem simply because the use of a student forum provided by a university turns, from time to time, to religious activities as well as political, cultural and social ones. The neutral accommodation by a public university of students whose activities are religious is far different than the total dedication of government-funded buildings to a sectarian institution for sectarian purposes.
 
 
 54
 This case is also distinguishable from those that involved the requested use of classrooms for prayer or Bible study by high school student groups. See, e. g., Brandon v. Board of Educ., 487 F.Supp. 1219 (N.D.N.Y.1980); Hunt v. Board of Educ., 321 F.Supp. 1263 (S.D.W.Va.1971). First, high school students necessarily require more supervision than do young adults of college age and this supervision necessarily poses a greater risk of entangling governmental authority in religious issues. Teachers ordinarily assigned to assist and supervise high school student groups may be thrust into an untenable position when assigned to supervise a prayer group. Even their presence in the room may suggest governmental approval of the religious activities of the group. There is no evidence in the record before us, however, that Cornerstone or any other student group at UMKC receives supervision or assistance from any member of the University's faculty.
 
 
 55
 Second, we recognize that since university students often rely on their college campus as their total community, they can expect from it a greater accommodation of their religious needs than high school students can from their schools. One commentator has noted that
 
 
 56
 the college or university should be viewed as a community, particularly in the case of the resident student who makes of the university his temporary home. Since much of his daily life is rooted in this community, there is greater reason for the public university to make certain specific accommodations of the student's religious interests than there is on the elementary and secondary school levels where the student lives at home. Considerations of both political and free exercise neutrality suggest that university officials should be able to extend official recognition to religious organizations, such as Newman and Hillel clubs, and make available to them campus facilities.
 
 
 57
 Giannella, Religious Liberty, Nonestablishment, and Doctrinal Development Part II: The Nonestablishment Principle, 81 Harv.L.Rev. 513, 583 (1968).
 
 III
 CONCLUSION
 
 58
 UMKC has the right, as do all public universities, to recognize student groups that seek to associate for the advancement of any and all ideas. It has exercised this right and has opened certain of its facilities to recognized student groups for lectures, discussions, symposiums, meetings, events and programs. But UMKC has denied access to these facilities to one such recognized student group based solely on its conclusion that the group's meetings include either religious worship or religious teaching. This denial clearly burdens the constitutional rights of the group's members and is not justified by a compelling state interest in avoiding an establishment of religion. A neutral accommodation of the many student groups active at UMKC would not constitute an establishment of religion even though some student groups may use the University's facilities for religious worship or religious teaching. Therefore, UMKC's regulation No. 4.0314.0107, which prohibits religious worship and religious teaching in the University's buildings or on its grounds, is not required by the Establishment Clause. Because of the burden it imposes on the rights guaranteed to the appellants by the First and Fourteenth Amendments of the federal Constitution, the regulation is invalid.
 
 
 59
 This matter is remanded to the district court for action consistent with this opinion. Costs will be taxed to the appellees. The appellants may file their request for attorneys' fees on this appeal with this Court within ten days of the issuance of the mandate. The appellees will then have ten days to make a response.
 
 DISSENT FROM DENIAL OF REHEARING
 
 60
 BRIGHT and McMILLIAN, Circuit Judges, dissenting.
 
 
 61
 We dissent from the ruling of the majority denying a rehearing en banc in this case. The case and the important issues it raises deserve the full attention of this court.
 
 
 62
 The University's petition for a rehearing en banc alleges in part that the panel opinion either misinterpreted or ignored the constitution and laws of the State of Missouri. Article I, § 7 of the Missouri Constitution explicitly requires
 
 
 63
 (t)hat no money shall ever be taken from the public treasury, directly or indirectly, in aid of any church, sect or denomination of religion * * *. (Emphasis added)
 
 
 64
 Additionally, Article IX, § 8 clearly states:
 
 
 65
 Neither the general assembly, nor any county, city, town, township, school district or other municipal corporation, shall ever make an appropriation or pay from any public fund whatever, anything in aid of any religious creed, church or sectarian purpose * * *. (Emphasis added)
 
 
 66
 The Missouri courts have long interpreted these provisions to be more restrictive than the first amendment to the United States Constitution in prohibiting expenditures of public funds in a manner tending to erode an absolute separation of church and state. American United v. Rogers, 538 S.W.2d 711, 720 (Mo.), cert. denied, 429 U.S. 1029, 97 S.Ct. 653, 50 L.Ed.2d 632 (1976); Paster v. Tussey, 512 S.W.2d 97, 101-02 (Mo.1974) (en banc), cert. denied, 419 U.S. 1111, 95 S.Ct. 785, 42 L.Ed.2d 807 (1975); Harfst v. Hoegen, 349 Mo. 808, 163 S.W.2d 609, 613-14 (Mo.1942) (en banc).
 
 
 67
 Significantly, this interpretation has received the approval of the federal judiciary in this circuit. As stated in Luetkemeyer v. Kaufmann, 364 F.Supp. 376 (W.D.Mo.1973), aff'd, 419 U.S. 888, 95 S.Ct. 167, 42 L.Ed.2d 134 (1974):
 
 
 68
 We conclude without hesitation that the long established constitutional policy of the State of Missouri, which insists upon a degree of separation of church and state to probably a higher degree than that required by the First Amendment, is indeed a "compelling state interest in the regulation of a subject within the State's constitutional power(.)" * * * That interest, in our judgment, satisfies any possible infringement of the Free Exercise Clause of the First Amendment or of any other prohibition in the Constitution of the United States. * * *
 
 
 69
 The fact that Missouri has determined to enforce a more strict policy of church and state separation than that required by the First Amendment does not present any substantial federal constitutional question. The Supreme Court has clearly indicated that there is an area of activity which falls between the Establishment Clause and the Free Exercise Clause in which action by a State will not violate the former nor inaction, the latter. (Id. at 386.)
 
 
 70
 The panel decision, however, only cryptically refers to the role of state law in this case, and even then only by way of footnote.
 
 
 71
 The University also contends that Missouri's long history of strict separation of church and state constitutes a compelling state interest that justifies burdening appellants' First and Fourteenth Amendment rights. See Luetkemeyer v. Kaufmann, 364 F.Supp. 376 (W.D.Mo.1973), aff'd, 419 U.S. 888, 95 S.Ct. 167, 42 L.Ed.2d 134 (1974). For the reasons stated in the text, we disagree. Moreover, it is difficult to believe that the University is as concerned with the strict separation of church and state as it here contends. * * * (Chess et al. v. Widmar et al., 635 F.2d 1316 at 1316, n.7 (8th Cir. 1980).)
 
 
 72
 In our judgment that footnote inadequately addresses this serious and important contention. The text does not respond to the issue, and the panel's rejection of this contention because of the lack of "concern" demonstrated by the University for separation of church and state disregards the real issues-whether the state constitution mandates strict separation of church and state when it comes to use of University buildings for formalized or denominational worship services by a student group, and whether that mandate overrides any infringement of the students' free exercise rights under the United States Constitution.
 
 
 73
 Moreover, the case raises significant issues under the first amendment religion clauses that we believe ought to be addressed by the full court, particularly because the case appears to be one of first impression in this circuit. The brevity of the first amendment and the absolute terms in which it is cast have provided the courts with a continuing source of difficulty in steering a course between the Scylla and Charybdis of the establishment and free exercise clauses.
 
 
 74
 We entertain considerable doubt that cases which permit expression of political and religious views in public places require that state institutions make its facilities available for denominational religious services.
 
 
 75
 These troubling questions, in our judgment, warrant a rehearing en banc.
 
 
 
 [1]
 The University bulletin describes the student activities program as follows:
 The student activities program is coordinated by the STUDENT ACTIVITIES OFFICE located in the University Center. Through various student organizations, boards and committees, cultural, social, educational and recreational programming is provided. The aim is to make student free time activity, a cooperative aid to academic study.
 In all its functions the student activities program encourages self-directed activity. This provides a great opportunity (for) self-realization and individual growth while participating in programming for the entire student population or for a special interest group. The overall goal is to develop social and cultural awareness as well as intellectual curiosity. Students plan events and programs in such a way that they learn while working and find enjoyment at the same time.
 In extracurricular affairs, students govern themselves in accordance with the All Student Association (ASA) constitution. The legislative body is the Student Council, a representative group of students elected annually by the student body. The ASA recommends funding and acts as an advocate of student rights.
 Activities provide an excellent opportunity for all students to meet and work with the administration and faculty, as well as local community groups. Social and fiscal responsibility and leadership in our democratic society (are) a prime requirement for the educated individual. Student activities (program) attempts to provide opportunity in these areas.
 Most activities and the ASA offices are housed in the University Center which is dedicated to serving the social, co-curricular and cultural needs of UMKC. Student programs in the University Center often include lectures, symposia, concerts, discussions, receptions, chess and bridge tournaments, as well as many other special events sponsored by the ASA and its programming division, the University Program Council.
 In a memorandum on UMKC's Student Activity Fee, Assistant Dean Paul Parker described two of the sponsored programs:
 CAMPUS WIDE PROGRAMS The Intramural Sports Program, Communiversity, the University News, the University Program Board, the Cultural and entertainment activities of the University Program Board and the Student Services Commission, all represent programs which have campus-wide appeal and interest. In general, these types of programs span the distance between school council programs and those of ethnic and/or special interest groups. Without this segment of student programming being active and creative, the campus' social, cultural, entertaining, and service needs would go unmet.
 SPECIAL INTEREST GROUPS Just as the University is responsive to the various educational needs of society, it must also be responsive to the various ethnic and non-academic special interest groups within the University. The University has officially recognized over 90 active student organizations, each with its specific area of interest. Ethnic organizations, such as Jewish College Students, United Mexican American Students, and The Afro-American Student Union, focus on the issues and concerns of their particular ethnic heritage. There are political organizations, such as Young Socialist Alliance, Women's Union, Young Democrats, and so forth. Also, there is a broad spectrum of nonethnic special interest groups such as the Fencing Club and Bridge and Chess Club, the Karate Club, Mortar Board, Omicron Delta Kappa, etc. These groups are formed by students to provide another dimension to the student's life on campus the extra and co-curricular experience.
 
 
 [2]
 We note that the parties have stipulated that there is no chapel on the UMKC campus
 
 
 [3]
 See infra, p. 1317
 
 
 [4]
 We think this omission was clear error. Both the original and the first amended complaint refer to "university facilities," not just to University buildings, and this term is broad enough to include the University's grounds
 
 
 [5]
 The protection afforded religious speech is derived from the Free Exercise Clause, the Free Speech Clause, or both. See Schaumburg v. Citizens for a Better Environment, 444 U.S. 620, 628-630, 100 S.Ct. 826, 831-832, 63 L.Ed.2d 73, 82-83 (1980)
 
 
 [6]
 In Healy v. James, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972), a student group seeking to organize an on-campus chapter of the Students for a Democratic Society was denied official recognition by a state college. Noting that the most important effect of the denial was the group's resulting inability to use the campus facilities for its meetings, id. at 176, 92 S.Ct. at 2343, the Court found the denial's effect was "a form of prior restraint" and that "a 'heavy burden' rests on the college to demonstrate the appropriateness of that action." Id. at 184, 92 S.Ct. at 2348
 In Gay Lib v. University of Missouri, 558 F.2d 848 (8th Cir. 1977), cert. denied, 434 U.S. 1080, 98 S.Ct. 1276, 55 L.Ed.2d 789 (1978), this Court considered a similar denial of official recognition by the University of Missouri to a student group seeking "to provide a forum for discussion about homosexuality." Id. at 850. Noting, as did Healy, that the denial was a prior restraint on free speech, we found that "the restriction of First Amendment rights in (this) context may be justified only by a far greater showing of a likelihood of imminent lawless action than that presented * * * ." Id. at 855.
 In Keegan v. University of Delaware, 349 A.2d 14 (Del. 1975), cert. denied, 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 342 (1976), the court concluded that a state university's prohibition on religious worship services in campus facilities, as applied to religious groups seeking to use the common room of a dormitory, impeded the observance of religion and could only be justified by the showing of a compelling state interest for the regulation.
 
 
 [7]
 The University also contends that Missouri's long history of strict separation of church and state constitutes a compelling state interest that justifies burdening appellants' First and Fourteenth Amendment rights. See Luetkemeyer v. Kaufmann, 364 F.Supp. 376 (W.D. Mo. 1973), aff'd, 419 U.S. 888, 95 S.Ct. 167, 42 L.Ed.2d 134 (1974). For the reasons stated in the text, we disagree. Moreover, it is difficult to believe that the University is as concerned with the strict separation of church and state as it here contends. The regulation at issue specifically states that the ban on the use of University facilities for religious worship or teaching is not to be interpreted "to forbid the offering of prayer or other appropriate recognition of religion at public functions held in University facilities." Regulation No. 4.0314.0107. This exception creates a greater danger of placing the University's imprimatur on religion than would granting Cornerstone's request for a meeting place
 
 
 [8]
 Student use of University facilities is, of course, subject to such reasonable limitations as to time, place and manner as the University may deem appropriate. See Healy v. James, supra, 408 U.S. at 192-193, 92 S.Ct. at 2351-2352. "Associational activities need not be tolerated where they infringe reasonable campus rules, interrupt classes, or substantially interfere with the opportunity of other students to obtain an education." Id. at 189, 92 S.Ct. at 2350
 
 
 [9]
 In an affidavit filed with the district court, a Cornerstone member stated:
 Having to explain that we have to meet off campus tends to make students think that there is something "wrong" with us and that there is something wrong with religion since it has been banished from the campus. * * * This type of thinking is a large barrier to the effectiveness of our message and the purposes of our group.
 
 
 [10]
 Our society's broadening definition of religion is reflected in Torcaso v. Watkins, 367 U.S. 488, 495 & n. 11, 81 S.Ct. 1680, & n. 11, 6 L.Ed.2d 982 (1961), where the Court indicated that nontheistic religions, including Buddhism, Taoism, Ethical Culture and Secular Humanism, were included in the protection afforded by the Free Exercise Clause. Similarly, in United States v. Seeger, 380 U.S. 163, 166, 85 S.Ct. 850, 854, 13 L.Ed.2d 733 (1965), the Court indicated that conscientious objector protection would extend to those whose nontheistic beliefs occupy a place in their lives parallel to that filled by an orthodox belief in God of one historically entitled to the exemption. See also L. Tribe, American Constitutional Law 826-833 (1978)