PETER KENT & others vs. COMMISSIONER OF EDUCATION
& others
(and a consolidated action[1]).

Suffolk. March 7, 1980. — March 26, 1980.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, WILKINS, LIACOS, & ABRAMS, JJ.

*Constitutional Law*, Establishment of religion. *Religion. Education*,
Prayer in schools.

General Laws c. 71, § 1A, as appearing in St. 1979, c. 692, which pro-
vides that a period of prayer may be offered by a student volunteer in
all public schools with an excusal provision for those students who do
not wish to participate, violates the establishment clause of the First
Amendment to the United States Constitution. [238-245]

CIVIL ACTION commenced in the Supreme Judicial Court
for the county of Suffolk on February 6, 1980.
The case was reported by *Wilkins, J.*
*Kenneth A. Sweder & Mark A. Michelson* for the plain-
tiffs.
*Stephen Schultz*, Administrative & Legal Counsel to the
Attorney General, for the Commissioner of Education.
*William J. Clary*, for the Massachusetts Citizens for
Public Prayer, amicus curiae, submitted a brief.
*Philip S. Nyman*, for Paul J. Pierce, amicus curiae, sub-
mitted a brief.
*Daniel J. Popeo & Paul D. Kamenar* for the Washington
Legal Foundation, amicus curiae, submitted a brief.
*Leonard Zakim, William I. Cowin & Herbert Lemel-
man*, for the Anti-Defamation League of B'nai B'rith,
amicus curiae, submitted a brief.
KAPLAN, J. *Procedural steps.* The plaintiffs in these ac-
tions are children attending public schools in the towns of

[1] David Warren & others vs. Commissioner of Education & others.
The parties in the two actions are described in the opinion.

Framingham and Marblehead, and their parents; the defendants are the Commissioner of Education of the Commonwealth and the members of the school committees and superintendents of schools of Framingham and Marblehead. Filed in the Supreme Judicial Court for the county of Suffolk on February 6, 1980, the actions sought (i) declarations that the new so called "school prayer law" — G. L. c. 71, § 1A, inserted by St. 1979, c. 692, enacted on November 7, 1979, and becoming effective on February 5, 1980 — was unconstitutional, and (ii) injunctions that would forbid enforcement or implementation of the law.

The defendant school committees and superintendents failed to appear in the actions although duly summoned. The Commissioner of Education, added as a defendant in the actions on motion of the plaintiffs, answered the complaint with certain denials.

On February 19 the parties presented a joint motion to the single justice to reserve and report the actions to the full court; appended to and incorporated in the motion was a statement of agreed facts. On the same day, the single justice consolidated the actions and allowed the motion. Argument was heard by the full court on March 7. As expedition was requested by the parties and appeared essential, the court, after deliberation, issued its order on March 13, granting the plaintiffs relief. It was indicated that an opinion and rescript would follow.

*Substance of the actions.* Chapter 692 of the statutes of 1979, the legislation under attack, was entitled "An Act offering a period of prayer in public schools." It struck out § 1A of c. 71 of the General Laws (as then most recently amended by St. 1973, c. 621),[2] and inserted in its place the following § 1A:

---

[2] Former § 1A provided: "At the commencement of the first class of each day in all grades in all public schools the teacher in charge of the room in which each such class is held shall announce that a period of silence not to exceed one minute in duration shall be observed for meditation or prayer, and during any such period silence shall be maintained and no activities engaged in."

The constitutionality of this statute was upheld in *Gaines* v. *Anderson*, 421 F. Supp. 337 (D. Mass. 1976) (three-judge court).

"At the commencement of the first class of each day in all grades in all public schools the teacher in charge of the room in which each such class is held shall announce that a period of prayer may be offered by a student volunteer, and during any such period an excusal provision will be allowed for those students who do not wish to participate."

According to the terms of the joint motion, the consolidated actions were reported solely on the plaintiffs' claim that § 1A (newly inserted) was unconstitutional on its face as violating the establishment clause of the First Amendment to the Constitution of the United States,[3] made applicable to the States by the Fourteenth Amendment, and as violating also the cognate provisions of the Constitution of the Commonwealth.[4] The statement of agreed facts furnished a background of facts of which the following are noted. The Commissioner advised certain chairpersons of local school committees and superintendents of schools that § 1A was to be regarded as presumptively valid until a court declared otherwise, and the statute was implemented in many schools after its effective date. At the commencement of classes each day, teachers in the respective schools announced the period of prayer. In many cases student volunteers offered audible prayers, some denominational (such as the Lord's Prayer or "Hail, Mary"), some clearly religious but not clearly denominational, some for secular objectives (such as the release of the hostages in Iran or victory in a volleyball game). When there were multiple volunteers, the teacher selected the one to offer prayer. Where

[3] The First Amendment is in part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."

[4] In responding to the establishment clause challenge, however, the defendant Commissioner reserved the right to raise arguments based on the free exercise clause in respect to those who wished to avail themselves of the opportunity to pray pursuant to § 1A.

no pupil volunteered, no prayer was given. Some pupils (including various of the plaintiff children) utilized their excusal rights; in those instances, the pupils were told to go to the corridor or to another part of the classroom apparently out of hearing of the prayer. Teachers in some schools excused themselves from listening to pupils' prayers. No disturbances on account of the implementation of § 1A were reported to the Commissioner up to February 14. There was no evidence that pupils of any age were unable to comprehend that school prayers were not school "lessons" to be learned like other aspects of the school program.

*Discussion.* The activity contemplated by § 1A, and actually carried out in the schools, was on its face religious in character. That is the intrinsic nature of "prayer" which seriously invokes the Deity. (Of course we are not dealing here with those customary or traditional references to God which have become merely ceremonial and have lost devotional content. Cf. *Colo* v. *Treasurer & Receiver Gen.*, 378 Mass. 550, 559-560 [1979].) Here, then, was a religious program which was sponsored and put into effect by State and local officials under aegis of State law; was conducted from day to day by teachers who are public employees in public schools; and was carried out on public property, during school time, and as part of the school exercises. The applicable precedents are clear that such a statute with such implementation violates the establishment clause as a law "respecting an establishment of religion." According to the precedents, the statute could not be saved from unconstitutionality by the fact that the prayers were spoken by volunteer pupils, or that pupils could choose to be excused from attending the prayers.

The actions at bar present the same questions in principle as arose in *Commissioner of Educ.* v. *School Comm. of Leyden*, 358 Mass. 776, cert. denied, 404 U.S. 849 (1971).[5]

---

[5] This court had previously held unconstitutional so much of G. L. c. 71, § 31, as provided: "A portion of the Bible shall be read daily in the public schools, without written note or oral comment; but a pupil whose

The Leyden school committee had passed a resolution mak-
ing available on every school day a period of five minutes
before class instruction was to begin, in which those teach-
ers or pupils "who may wish to participate voluntarily in the
free exercise of religion" might do so.[6]  Generally, at 8:40
A.M. (with regular class instruction to begin at 8:45), a pupil
or teacher would read from the Bible or other inspirational
text, or recite a prayer, which might be traditional (such as
the Lord's Prayer) or innovative.  Those pupils who chose
not to attend might play outside the school building, or re-
main in the school lobby or library area.  In an action by the
Commissioner of Education against the Leyden school com-
mittee to enjoin the carrying out of the resolution,[7] this
court held that the resolution and the practice under it were
unconstitutional and ruled that "neither students nor teach-

parent or guardian informs the teacher in writing that he has con-
scientious scruples against it, shall not be required to read from any par-
ticular version, or to take any personal part in the reading. . . ." *Attor-
ney Gen.* v. *School Comm. of N. Brookfield,* 347 Mass. 775 (1964). *Waite*
v. *School Comm. of Newton,* 348 Mass. 767 (1964).

[6] The resolution was as follows: "On each school day, before class in-
struction begins, a period of not more than five minutes shall be available
to those teachers and students who may wish to participate voluntarily in
the free exercise of religion as guaranteed by our United States Constitu-
tion.  This freedom of religion shall not be expressed in any way which
will interfere with another's rights.  Participation may be total or partial,
regular or occasional or not at all.  Non-participation shall not be con-
sidered evidence of non-religion nor shall participation be considered evi-
dence of recognizing an establishment of religion.  The purpose of this
. . . [resolution] is not to favor one religion over another nor to favor
religion over non-religion, but rather to promote love of neighbor, broth-
erhood, respect for the dignity of the individual, moral consciousness, and
civic responsibility; to contribute to the general welfare of the community
and to preserve the values that constitute our American heritage."  358
Mass. at 777 n.1.

[7] The Commissioner brought the action notwithstanding G. L. c. 71,
§ 1B, reading thus: "The school committee of any city or town may per-
mit any child attending its public schools to participate in voluntary
prayer with the approval of such child's parents before the commence-
ment of each daily school session.  Notwithstanding any provision of law
to the contrary, no city or town which permits such prayer shall be denied
any funds for school purposes to which it may be entitled from the com-
monwealth."

ers may be allowed to participate in the well-intended observances on school property authorized by the Leyden resolution." 358 Mass. at 780.[8] We felt bound and controlled by decisions of the Supreme Court of the United States, notably *Abington School Dist. v. Schempp,* 374 U.S. 203 (1963), and *Engel* v. *Vitale,* 370 U.S. 421 (1962).[9] Under the authorities the establishment clause is interpreted to prohibit religious observances on public school property even when these are nondenominational and participation in them on the part of pupils is voluntary.

We find no substantial basis for distinguishing the situation produced by § 1A from that considered in the *Leyden* case; indeed the situation generated by § 1A might seem the more vulnerable under the establishment clause. For under § 1A the religious exercise took place during school hours, not before the commencement of regular classes; there was no ambiguity about the characterization of the recitations called for; teachers were involved through having to announce the period of prayer and select the volunteer, and they (or, presumably, other school authorities) were to see that prayer and not something else was offered, and that arrangements were made for the excusal.

We said in the *Leyden* case that a judgment of invalidity of such a program was compelled "[u]ntil and unless" the Supreme Court of the United States "limited the broad lan-

---

[8] See the similar case of *State Bd. of Educ.* v. *Board of Educ. of Netcong,* 57 N.J. 172, aff'g 108 N.J. Super. 564 (1970), cert. denied, 401 U.S. 1013 (1971).

[9] The *Engel* case involved a denominationally neutral prayer composed by the State board of regents which was to be recited at the beginning of each school day, with provision that pupils might remain silent or be excused from the room. In the *Schempp* case a Pennsylvania statute required that ten verses from the Bible be read without comment at the opening of each school day; a child could be excused from the exercise upon written request of his parent. A companion case to *Schempp* tested a rule of the Baltimore school board requiring the school, "collectively or in classes," to be opened by the reading without comment of a chapter of the Bible or the Lord's Prayer, with excusal on written request of the parent. See also *Chamberlin* v. *Dade County Bd. of Pub. Instruction,* 377 U.S. 402 (1964).

guage" of the *Schempp* and like cases. 358 Mass. at 780.[10]
Neither the diligence of counsel nor our own reading has
discovered any "limitation" in later Supreme Court deci-
sions so far as concerns the issue of prayer in public schools.

The Court's opinion in the *Schempp* case articulated and
applied two tests or guidelines for the decision of establish-
ment clause cases of that order. The Court said (374 U.S. at
222): "[T]he Establishment Clause has been directly con-
sidered by this Court eight times in the past score of years
and, with only one Justice dissenting on the point, it has
consistently held that the clause withdrew all legislative
power respecting religious belief or the expression thereof.
The test may be stated as follows: what are the purpose and
the primary effect of the enactment? If either is the ad-
vancement or inhibition of religion then the enactment ex-
ceeds the scope of legislative power as circumscribed by the
Constitution. That is to say that to withstand the strictures
of the Establishment Clause *there must be a secular legisla-
tive purpose and a primary effect that neither advances nor
inhibits religion.*" (Emphasis added.)[11]

---

[10] We said: "The Supreme Court thus far has not limited the broad lan-
guage with which (as in the *Schempp* case) it has held invalid substan-
tially nondenominational and neutral religious observances on public
school property. Until and unless such a limitation takes place (even if
there is minimal State encouragement of only insubstantial school
religious exercises), it would serve no useful purpose to attempt to draw
any fine distinction between those observances which have hitherto been
proscribed by the Supreme Court and the Leyden practices now presented
for our scrutiny. We think that, under the applicable First Amendment
decisions, neither students nor teachers may be allowed to participate in
the well-intended observances on school property authorized by the Ley-
den resolution." 358 Mass. at 780.

[11] Later cases, concerned with the proper limits of public funding of
particular activities of schools having some religious aspects, evolved a
third guideline and implicitly a fourth. See *Colo* v. *Treasurer & Receiver
Gen.*, 378 Mass. 550, 558 (1979); "[W]e are aided by the criteria which
have been established by the United States Supreme Court for judging
claims arising under the First Amendment, which criteria we believe are
equally appropriate to claims brought under cognate provisions of the
Massachusetts Constitution. These criteria involve the application of the
following three 'tests': (1) is there a 'secular legislative purpose,' (2) does
the primary effect of the challenged practice 'neither advance nor inhibit

First, as to secular purpose. Former § 1A provided for a minute of silence for meditation or prayer (see n.2). New § 1A dropped silence and meditation and was directed to prayer only. This emphasis appeared on the face of the preamble and text of the statute. But prayer is necessarily religious, not secular. As was said in *Gaines* v. *Anderson,* 421 F. Supp. 337, 343 (D. Mass. 1976), "Unlike the word 'meditation', the word 'prayer' in its usual and ordinary sense has a specifically religious meaning. It is settled that the state cannot utilize its power or prestige or influence to advance or encourage religion, [citing cases] and if the amendment here [an amendment of 1973 adding the words "or prayer" after "meditation," see n.2] has the purpose or primary effect of encouraging the religious activity of prayer the statute would be rendered unconstitutional."

In his brief and oral argument counsel for the defendant suggested that a prayer beseeching a secular objective, say the release of hostages, might be called secular or nonreligious. This proposition would perhaps avail little, even if it were correct, for the statute admitted also of prayers, denominational and nondenominational, which on any view must be considered religious, and such prayers were in fact offered. But the proposition suggested by counsel is not correct. The question is not what a suppliant asks but to whom he addresses his supplication. The religious aspect is evident where the prayer is sectarian, or devotional without being sectarian; it seems to us not less evident when the suppliant seeks a secular result, for he is still addressing himself to the Deity, to Whom he often also offers praise and thanks.

---

religion,' and (3) is there avoidance of 'excessive government entanglement' with religion? *Lemon* v. *Kurtzman,* 403 U.S. 602, 612-613 (1971). *Arno* v. *Alcoholic Beverages Control Comm'n,* 377 Mass. 83, 91 (1979). We also note that the Supreme Court has cautioned that these 'tests' are not 'precise limits to the necessary constitutional inquiry,' but are instead guidelines to a proper analysis. *Meek* v. *Pittenger,* 421 U.S. 349, 359 (1975). Indeed, there is a 'significant fourth factor' implicit in the analysis the Court has undertaken — that is, whether the challenged practice has a 'divisive political potential.'" We need not enter on the latter two standards. And see n.12 below.

Counsel tried to find secular purposes in the supposed side effects of uttering or attending to prayer, such as promoting awareness and tolerance of the various sects or groups in the community, but, as was said in *DeSpain* v. *DeKalb County Community School Dist.*, 384 F.2d 836, 839 (7th Cir. 1967), cert. denied, 390 U.S. 906 (1968), these could be only "adjunctive or supplemental" to the "basic and primary purpose." To accept the line of argument would go some distance in destroying the First Amendment guaranty, since "adjunctive" purposes could be urged even for compulsory sectarian prayer.[12]

Second, as to the effects of the statute in respect to an advancement of religion. The argument tendered here reduced essentially to the point that there could be no "advancement" because the prayers were voluntary — they emanated from those who felt the desire to pray, and were heard by those who chose to attend. Nevertheless, the statute lent no small degree of official recognition and sanction to the religious enterprise and welded it into the school day. When prayers were daily heard in most classrooms of many public schools in the Commonwealth, and this occurred as a result of legislative enactment, it was more than a strain to attempt to argue that religion was not being advanced in the sense of the Constitution. And, as has been repeatedly observed, the supposed "voluntariness" of attending such religious exercises is hardly a robust or realistic conception when the choice is made by impressionable youngsters inclined to conformity, or by parents fearful of the psycholog-

---

[12] Under the establishment clause, the question of "purpose" may become elusive, and the "test" somewhat attenuated, in the public funding cases (of which the latest is *Committee for Pub. Educ. & Religious Liberty* v. *Regan*, 444 U.S. 646 [1980]), but we believe the question remains relatively simple and the test a substantial and serious one in the field of school prayer.

The Constitution of the Commonwealth with its "anti-aid" provision (art. 18, § 2, of the Articles of Amendment, as amended by art. 103) is more definite on the problem of public funding than the establishment clause. See *Bloom* v. *School Comm. of Springfield*, 376 Mass. 35 (1978), and *Haddad* v. *School Comm. of Worcester*, 376 Mass. 51 (1978).

ical effects on their children of requiring them to claim release from the morning prayer. See Brennan, J., concurring, in *Schempp*, 374 U.S. at 287-294.

We should not ignore the point that the prayers offered would have predominantly the colors of the religions chiefly practiced in the population, and thereby inevitably propagate religion with some measures of bias, even though bias was unintended. This warns of ultimate dangers: "The wholesome 'neutrality' of which this Court's cases speak thus stems from a recognition of the teachings of history that powerful sects or groups might bring about a fusion of governmental and religious functions or a concert of dependency of one upon the other to the end that official support of the State or Federal Government would be placed behind the tenets of one or of all orthodoxies. This the Establishment Clause prohibits." *Schempp* at 222.

There are parents, argued the defendant, for whom religion is so far a necessary constituent of their daily lives that they find it hard to abide a school day for their children in which a religious impulse is not in some way given voice; and there may be children who themselves have the same intense diurnal religious need and involvement. It was suggested that to invalidate § 1A was to prohibit to such votaries the Free Exercise of religion (see note 4). The constitutional answer is that it is not unreasonable to ask those parents and children to find accommodation for their religious practices outside the classrooms of public schools, for example, in the home.

This court has recognized the unwisdom, as well as the futility, of trying to separate Church from State by an impenetrable barrier.[13] The present decision is not a manifestation of any such extreme view. It is a clear and inevitable

---

[13] *Colo* v. *Treasurer & Receiver Gen.*, 378 Mass. 550 (1979), sustained the constitutionality of the provision of compensation to chaplains of the House of Representatives and the Senate of the General Court, but sharply distinguished the issue of school prayer (at 559). See also *Arno* v. *Alcoholic Beverages Control Comm'n*, 377 Mass. 83 (1979).

application of the establishment clause, at the heart of the First Amendment.[14]

*Disposition.* The judgment on rescript will declare and adjudge as follows: (1) that G. L. c. 71, § 1A, as inserted by St. 1979, c. 692, is declared unconstitutional as in violation of the establishment clause of the First Amendment to the Constitution of the United States, applicable to the States through the Fourteenth Amendment; and (2) that the defendants and their officers, agents, servants, employees, and attorneys are permanently enjoined and restrained from enforcing, implementing, or carrying out, or assisting in the enforcement, implementing, or carrying out of any of the provisions of the aforementioned G. L. c. 71, § 1A.[15]

---

[14] As the case can be readily decided by reference to the establishment clause, we need not rest on State constitutional provisions which the parties have chosen not to argue or brief in detail.

[15] Briefs were submitted on behalf of Massachusetts Citizens for Public Prayer, Paul J. Pierce, Washington Legal Foundation, and Anti-Defamation League of B'nai B'rith, as friends of the court.