TAUNTON EASTERN LITTLE LEAGUE vs. CITY OF TAUNTON.

Bristol.  March 8, 1983. — July 18, 1983.

Present: HENNESSEY, C.J., WILKINS, LIACOS, NOLAN, & O'CONNOR, JJ.

*License.  Constitutional Law,* Establishment of religion.  *Practice, Civil,*
Action in nature of certiorari.

A city council which, with the expressed intention of protecting revenues
   received by a church parish from its licensed Thursday night beano
   games, rescinded its approval of the application of a nonprofit athletic
   association for a license to conduct competing beano games on Thurs-
   day nights, did not thereby violate the establishment clause of the First
   Amendment to the Federal Constitution, as made applicable to the
   States by the Fourteenth Amendment, where the council acted with a
   secular purpose based on religiously neutral criteria, namely prevent-
   ing the possible closing of the parish's school for lack of funds, with a
   resulting impact on the public school system.  [721-728]

CIVIL ACTION commenced in the Superior Court Depart-
ment on March 24, 1981.

The case was heard by *Staff,* J., a District Court judge sit-
ting under statutory authority.

After review was sought in the Appeals Court, the Su-
preme Judicial Court ordered direct appellate review on its
own initiative.

*James H. Fagan* for the plaintiff.

*David T. Gay,* City Solicitor, for the defendant.

HENNESSEY, C.J.  The plaintiff brought an action in the
Superior Court under G. L. c. 249, § 4, seeking to quash a
decision of the municipal council of the city of Taunton
(council).  The challenged decision rescinded the council's
prior approval of the plaintiff's application for a beano
license.  The Superior Court upheld the decision, and the

plaintiff appealed.[1]  We transferred the case to this court on our own motion.  We affirm.

The parties agreed to the following facts.  The Taunton Eastern Little League (Little League) is an organization eligible to receive a beano license from the State Lottery Commission (commission) under G. L. c. 10, § 38.[2]  Pursuant to § 38, the Little League filed an application with the council for a license to conduct a beano game on Thursday nights in

---

[1] As a threshold matter, the defendant suggests that no one has a right to appeal a decision revoking a beano license.  General Laws c. 10, § 38, as amended through St. 1982, c. 207, provides that "[s]uch license may be revoked at the discretion of the director and shall be suspended or revoked upon written request to the director by the city or town approving authority . . . .  The action of the director in suspending or revoking a license shall be final, and the licensee shall not have a right of appeal."  Nevertheless, the exercise of administrative discretion is limited by constitutional principles.  We have stated that "[i]n the absence of a statutory method of judicial review, certiorari is an appropriate mode for correcting errors of law arising out of an administrative action."  *Reading* v. *Attorney Gen.*, 362 Mass. 266, 269 (1972).  See *Bennett* v. *Aldermen of Chelsea*, 361 Mass. 802, 806-807 (1972); *Dixie's Bar, Inc.* v. *Boston Licensing Bd.*, 357 Mass. 699, 702-703 (1970); *Opinion of the Justices*, 321 Mass. 759, 765 (1947); *Hough* v. *Contributory Retirement Appeal Bd.*, 309 Mass. 534, 535 (1941); *Scudder* v. *Selectmen of Sandwich*, 309 Mass. 373, 375-377 (1941).  "Although Mass. R. Civ. P. 81 (b), 365 Mass. 841 (1974), abolished the writ of certiorari, relief in the nature of certiorari is available in the Superior Court pursuant to G. L. c. 249, § 4."  *Konstantopoulos* v. *Whately*, 384 Mass. 123, 128 (1981).

[2] General Laws c. 10, § 38, lists the types of organizations which may receive a license from the State Lottery Commission to conduct a beano game in a city or town which has voted to allow the granting of licenses for such games.  "Any fraternal organization having chapters or branches in at least one other New England state, or any fraternal organization organized under the provisions of chapter one hundred and eighty, any religious organization under the control of or affiliated with an established church of the commonwealth and any veterans' organization incorporated or chartered by the Congress of the United States or listed in clause (12) of section five of chapter forty, any volunteer, non-profit fire company or similar organization furnishing public fire protection, any voluntary association for promotion of the interests of retarded children, the Boston Firemen's Relief Fund, any volunteer, non-profit organization furnishing a public ambulance service, and non-profit athletic associations" is eligible.  The application must first be approved, in the case of a city other than Boston, by a majority of the city council.  It is illegal to conduct a beano game other than one licensed under § 37 or § 38.  G. L. c. 271, § 22B.

Taunton. The council approved the application on February 24, 1981. The application was then sent to the commission. After approval by the commission, the only remaining step in the licensing procedure was for the license to be delivered to the Little League.

After the commission's approval, but before the license was delivered, members of Our Lady of Lourdes parish, a Roman Catholic religious organization, filed a petition asking the council to rescind its approval of the Little League's application. Our Lady of Lourdes parish already had a license to conduct a beano game on Thursday nights in Taunton. The council heard arguments on the petition on March 3 and March 17, 1981. The transcripts of these meetings were incorporated into the statement of agreed facts. At the conclusion of the March 17, 1981, meeting, the council voted to rescind its approval of the Little League's application.

The reason for rescission, as stated by the council, was to protect the revenues received by Our Lady of Lourdes parish from its Thursday night beano games from being diminished by the competition resulting from the operation of a beano game by the Little League on the same night. The council stated that its purpose in protecting those revenues is that they are used to support a private, Roman Catholic grammar school run by Our Lady of Lourdes parish and that, if the revenues dwindled because of competition, the school would be forced to close and the Taunton public school system would suffer a substantial impact from the resulting influx of students.

The city has not adopted any guidelines, ordinances, or regulations concerning the approval of beano licenses. At the time of the Little League's application, the city had a beano game licensed for each night of the week and for all times authorized by G. L. c. 10, § 38, so that the application for a license of the Little League would have resulted in the first license granted in competition with an existing license.

General Laws c. 10, § 38, authorizes certain organizations, including "any religious organization under the control of or

affiliated with an established church of the commonwealth," to receive a beano license from the State Lottery Commission. It provides in part that "[t]he profits of any game licensed to be conducted under this section shall be the property of the organization conducting said game, and shall be used for charitable, religious or educational purposes . . . ." The Little League does not challenge the constitutionality of § 38. Therefore, we assume for the purposes of this case that the Commonwealth may constitutionally allow churches to receive beano licenses and to use the funds earned from their beano games for religious purposes. Nor does the plaintiff rely on art. 18, § 2, the anti-aid amendment, or any other provision of the Massachusetts Constitution. The only issue presented for our consideration is whether the council violated the establishment clause of the First Amendment to the United States Constitution, as applied to the States through the Fourteenth Amendment, in rescinding its approval of the Little League's application.[3]

The Supreme Court of the United States has developed a three-part test to determine whether government action is constitutional under the establishment of religion clause. "First, the [action] must have a secular . . . purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion . . . finally, the [action] must not foster 'an excessive government entanglement with religion'" (citations omitted). *Lemon* v. *Kurtzman*, 403 U.S. 602, 612-613 (1971). See *Mueller* v. *Allen*, 463 U.S. 388, 392-394 (1983); *Stone* v. *Graham*, 449 U.S. 39, 40 (1980) (per curiam); *Kent* v. *Commissioner of Educ.*, 380 Mass. 235, 241 (1980); *Colo* v. *Treasurer & Receiver Gen.*, 378 Mass. 550, 558 (1979).

---

[3] The plaintiff also asserts that the council's action was arbitrary, capricious, or unreasonable, in violation of the rights of the members of the Little League to equal protection of the laws under the Federal and State Constitutions. Because the plaintiff did not present any argument on this issue in its brief, we do not consider it. Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 919 (1975). See *Goldman* v. *Dennis*, 375 Mass. 197, 199-200 (1978).

We conclude that the first of these three tests was satisfied in that there was a secular purpose. The parties agree that the council rescinded its approval of the plaintiff's license in order to keep open the Roman Catholic grammar school run by Our Lady of Lourdes parish, because the Taunton public school system would receive a substantial impact from the influx of students were the parochial school to close. In *Committee for Pub. Educ. & Religious Liberty* v. *Nyquist,* 413 U.S. 756, 773 (1973), the Supreme Court considered a program providing benefits to nonpublic schools, including tax credits and tuition reimbursements to parents of children attending nonpublic schools which served high concentrations of children from low income families. The Court struck down the program based on its *effect* (see *infra*) but, in discussing the secular *purpose* requirement, the Court acknowledged "the reality of [the State of New York's] concern for an already overburdened public school system that might suffer in the event that a significant percentage of children presently attending nonpublic schools should abandon those schools in favor of the public schools." *Id.* at 773. See *Mueller* v. *Allen, supra.* Compare *Stone* v. *Graham,* 449 U.S. 39, 41 (1980), where the Supreme Court rejected Kentucky's avowed secular purpose for posting the Ten Commandments on schoolroom walls, since the preeminent purpose was plainly religious. See *American Civil Liberties Union* v. *Rabun County Chamber of Commerce, Inc.,* 698 F.2d 1098, 1110 (11th Cir. 1983) (cross was maintained in State park for religious reasons, not to promote tourism); *Griswold Inn, Inc.* v. *State,* 183 Conn. 552, 560 (1981) (since Good Friday was only holiday on which sale of liquor was prohibited, prohibition had no secular purpose).

Although the finding of a secular purpose in *Nyquist* clearly rested on the broad class aided — nonpublic schools — we conclude that the *Nyquist* rationale is applicable here. The Council's decision concerned a single religious group only because the context, licensing, necessarily involves individual consideration of each licensee. The parish was one

of the groups authorized by § 38 to receive a beano license. In this situation, the fact that the council's decision focused on one parochial school does not establish that their decision had no secular purpose.

The plaintiff's main contention is that the council's action had the impermissible primary effect of advancing religion, and is consequently invalid under the second of the three tests. The plaintiff relies on several Supreme Court cases which invalidated various types of State aid to parochial schools because the aid was not limited to purely secular uses. See *Wolman* v. *Walter*, 433 U.S. 229, 236 (1977); *Meek* v. *Pittenger*, 421 U.S. 349, 358-359 (1975); *Committee for Pub. Educ. & Religious Liberty* v. *Nyquist*, 413 U.S. 756, 774 (1973). The Little League argues that under these cases the council's action was unconstitutional because it provided indiscriminate financial aid to a parochial school. These cases are inapposite because they involve the transfer of public funds in aid of parochial schools. *Wolman* invalidated statutes authorizing the expenditure of public funds to provide nonpublic schools with instructional materials, equipment and field trips; *Meek* invalidated State supported programs providing instructional materials, remedial testing, and therapeutic services conducted in sectarian schools; and *Nyquist* struck down statutes providing direct "maintenance and repair" grants to nonpublic schools, as well as tuition reimbursements and tax credits to parents in certain income brackets who sent their children to nonpublic schools. In the instant case, the council's action did not provide public funds to Our Lady of Lourdes parish. While it is clear that government action can violate the establishment clause without involving the expenditure of public funds, see, e.g., *Larkin* v. *Grendel's Den, Inc.*, 459 U.S. 116 (1982), the absence of this factor in the instant case distinguishes it from those involving public aid to sectarian institutions. Moreover, G. L. c. 10, § 38, provides that in the case of religious organizations the revenues earned from beano games shall be used for religious purposes. Absent a challenge to the statute, the plaintiff cannot argue that

funds received by a parochial school from a beano game constitute State financial aid to religion.[4]

We conclude that the council's action preferring the parish over the Little League did not have the primary effect of advancing religion. Although the council's decision clearly resulted in an indirect benefit to a religion, that benefit was incidental to a secular purpose, that of avoiding a potential substantial impact upon the public school system. Although not precisely on point, the situation is similar to that of *Widmar* v. *Vincent,* 454 U.S. 263 (1981), where the Supreme Court held that there was a secular purpose and effect in allowing a student religious group to use buildings in a public college which were open to all school organizations. The Court reasoned that the open forum established by the university served a secular purpose, and that "the University does not thereby endorse or promote any of the particular ideas aired there." The Court distinguished "those cases in which this Court has invalidated statutes permitting school facilities to be used for instruction by religious groups, but *not* by others. . . . In those cases the school may appear to sponsor the views of the speaker." *Id.* at 271-272 n.10. As to effect, the Court acknowledged the possibility that religious groups would benefit from access to university facilities, but was "satisfied that any religious benefits . . . would be 'incidental' within the meaning of our cases." Two factors were "especially relevant. First, an open forum in a public university does not confer any imprimatur of State approval on religious sects or practices . . . . Second, the forum is available to a broad class of nonreligious as well as religious speakers." *Id.* at 274. See *Mueller* v. *Allen, supra* at 392-399.

---

[4] We note that in *Hunt* v. *McNair,* 413 U.S. 734, 745 n.7 (1973), the Court expressly did not decide whether the creation of an instrumentality through which educational institutions could borrow funds on the basis of their own credit, but on terms more favorable than would otherwise be available, provided impermissible State aid to religion. Cf. *Walz* v. *Tax Comm'n of the City of N.Y.,* 397 U.S. 664, 674-675 (1970) (tax exemptions for churches upheld, although they provide some economic benefit to churches; Court noted that there was no transfer of public funds).

Similarly, in *O'Hair* v. *Andrus,* 613 F.2d 931 (D.C. Cir. 1979), the plaintiffs argued that by allowing the Pope to celebrate a Mass on the National Mall in Washington, D.C., the government approved of, and thereby established, the service. The regulations governing use of the mall were facially neutral, and were applied alike to religious and nonreligious activity. Therefore, the court concluded, the government's action "implies no more approval for this church than for any other group using the Mall." *Id.* at 936. Cf. *Gilfillan* v. *Philadelphia,* 637 F.2d 924, 930 (3d Cir. 1980), cert. denied, 451 U.S. 987 (1981) (*expenditure of municipal funds* for crucifix, flowers, and special platform from which Pope spoke had no secular purpose).

Finally, in *Walz* v. *Tax Comm'n of the City of N.Y.,* 397 U.S. 664, 674 (1970), the Supreme Court upheld tax exemptions for a broad class of nonprofit groups, including churches, although such a tax exemption "necessarily operates to afford an indirect economic benefit" to a church.

These cases indicate that allowing religious use of State facilities or benefits as part of a neutral policy does not result in the impermissible State sponsorship of religion which the establishment clause forbids. The fundamental requirement is that the government must treat religious and nonreligious groups equally. Thus, in *Widmar* v. *Vincent, supra* at 275, the Court's holding was based on "the absence of empirical evidence that religious groups will dominate [the university's] open forum." And in *O'Hair* v. *Andrus, supra* at 936, the court noted that the "regulations have provisions to guard against excessive use and appropriation of the parkland by any group."

Section 38 allows a broad class of groups to be licensed to conduct beano games.[5] Thus, although the council's decision did have the effect of facilitating the expenditure of beano profits for the parochial school, it was not impermissible aid to religion as long as the council's decision preserved the neutral statutory scheme. The statutory language

---

[5] See note 2, *supra.*

(license shall be revoked upon written request by town) clearly implies that a municipality has broad discretion to limit the number of beano licenses for any valid reason in the public good.[6]  Cf. *Douglas* v. *Kentucky*, 168 U.S. 488, 502 (1897); *Stone* v. *Mississippi*, 101 U.S. 814, 821 (1879). In particular, the Legislature must have intended that the beano operations authorized by § 38'be reasonably profitable, so that these profits might be applied to the enumerated ends, including religious purposes.  The record of the meetings demonstrates that the council concluded that two beano games could not be operated profitably in Taunton on Thursday nights.

Since the council was faced with a choice between two competing licensees, its decision to prefer the church was constitutionally permissible so long as the decision was based on religiously neutral criteria.  A contrary analysis would require that the council could not have rescinded its approval of the Little League's license for any reason — for example, based on a policy to prefer existing licensees — because the decision would have had the effect of enhancing the parish revenues.  We do not think the establishment clause so requires.  In the instant case, the council's decision was made for a purpose which the Supreme Court has approved as secular.  See *Nyquist, supra*.  Therefore, although the council's decision took account of the religious nature of the parish and parochial school, we are of the opinion that the decision preserved the "neutrality" of the statutory scheme within the meaning of *Widmar* and *Walz*.  We conclude that the revocation of the Little League's license did not have the impermissible primary effect of aiding religion.

---

[6] The council had not adopted any rules limiting the number of beano licenses prior to the Little League's application.  However, it was within the council's discretion to decide to limit the number of licenses at any time.  The parties agree that the Little League's license was the first granted in competition with an existing license.

We see no basis on which the council's decision can be said to result in impermissible government entanglement with religion. Cf. *Lemon* v. *Kurtzman*, 403 U.S. 602, 614-625 (1971). Accordingly, the judgment of the Superior Court is affirmed.

*So ordered.*