Doerfer, J.
The defendant, Louis Arey, has been indicted for indecent assault and battery and open and gross lewd and lascivious behavior. The defendant seeks to suppress certain statements made by him to Bruce Hudson (“Hudson”), an employee of the Office for Children (“OFC”), when Hudson served him with a *56 Notice of Emergency Suspension of his and his wife’s child care license. After a review of the credible testimony and evidence, the defendant’s motion is denied.
FINDINGS OF FACT
On February 2, 1994, the mother of a child “B.K.”[1] contacted Detective Laskey of the Billerica Police Department and alleged that the defendant had sexually abused her daughter at the Arey Country Day School.[2] Detective Laskey prepared and submitted a mandatory report of the alleged abuse to the Department of Social Services (“DSS”). G.L.c. 119, §51A.
On February 3, 1994, Kathy Keratropoulos, the DSS worker assigned to the case, scheduled a SAIN[3] interview of B.K.[4] A SAIN team is composed of representatives from the various agencies which are assigned to a child abuse case. To spare a child abuse victim the anxiety of undergoing a separate interview at each agency, one member of the SAIN team will conduct an interview, while the other members observe and listen behind a mirrored window. On February 8, 1994, the SAIN interview was conducted at the District Attorney’s Office in Somerville. The SAIN team included Jeff Roberts (SAIN Coordinator), Kathy Keratropolous, Stephanie Gratton (Child Interviewer), Veronica Serrato (Assistant District Attorney) and Pam Pinaeton (Victim/Witness Advocate).[5] The court finds that the purpose of the SAIN team was to conduct one interview of the allegedly abused child, rather than to expose the child to several interviews by various agencies. The court further finds that the District Attorney did not control the SAIN team nor use it as a subterfuge to prepare a criminal case, but rather merely helped to coordinate the investigations of other agencies involved in the case.
As an agency which licenses day care centers, G.L.c. 28A, §1 et seq., 102 CMR 7.03(21), the OFC was notified of the matter by Assistant District Attorney Veronica Serrato on February 8, 1994. OFC Agent Ann Connors contacted the DSS, at which time it was agreed that after Detective Laskey interviewed the defendant, Ann Connors and Kathy Keratropoulos would go to the defendant’s home to interview both Mr. and Mrs. Arey.
On February 9, 1994, Detective Laskey went to the defendant’s home. Detective Laskey explained to the defendant his Miranda rights and asked him to sign a waiver form. Detective Laskey testified that the defendant stated that he did not understand the form and refused to sign the waiver. The defendant, however, proceeded to deny all of the accusations made against him. The defendant did acknowledge that he knew the child and members of her family. Detective Laskey stated in his report that he was “not sure if he fully understood why I was there or the seriousness of the complaint.” At the evidentiary hearing, Detective Laskey remained uncertain as to the defendant’s mental awareness, but could not conclude that the defendant did not understand the purpose for the interview on February 9, 1994.
The court finds that the defendant was not mentally or physically impaired at the time he refused to sign the Miranda waiver. Detective Laskey was the only witness who questioned the defendant’s full understanding and he testified that he could not render any definitive conclusions on this matter. Rather, the weight of the evidence indicates, at most, that the defendant is a seventy-year-old man with diabetes. Because the court was not given any medical evidence which is persuasive that he is mentally or physically impaired, the court does not find that the defendant suffered from a mental or physical handicap at any time during the investigation.
On the same day, Ann Connors and Kathy Keratropoulos went to the defendant’s home. Mrs. Arey refused to speak with either of them without her attorney being present. Mrs. Arey then contacted Attorney Dangora by phone and Attorney Dangora arrived at the defendant’s home. Attorney Dangora ordered Kathy Keratropoulos to leave the home. Attorney Dangora allowed Ann Connors to interview Mrs. Arey in his presence, but he refused to allow Ann Connors to interview the defendant.
On February 11, 1994, Nicki Famiglietti, OFC General Counsel, contacted Attorney Dangora to inform him that OFC was suspending the Arey Country Day School’s license by way of a Notice of Emergency Suspension. Famiglietti informed Attorney Dangora that the Notice of Emergency Suspension would be delivered to the Areys, but made no representations as to the manner in which the Notice would be delivered. The court finds credible Famiglietti’s testimony that OFC needed to deliver the Notice of Emergency Suspension in-hand before Monday in order to allow parents of the children enrolled in the Arey Country Day School to find alternative day care. The court also finds that, due to a snow storm, OFC could not make in-hand service on Friday.[6] Thus, the court finds that Bruce Hudson, even though he was the Director of Investigations and Special Operations for the OFC, had a good faith purpose in travelling to the Arey’s home on Saturday, February 12, 1994, to deliver the Notice of Emergency Suspension.
On February 12, 1994, at approximately 12:30 p.m., Hudson arrived at the Arey’s residence. The defendant answered the door and Hudson identified himself and informed the defendant of his purpose, which was to issue the Notice of Emergency Suspension. Hudson testified that the defendant was dressed in outerwear and appeared lucid and healthy. The defendant responded, “I know why you’re here, I’ve been expecting you.” Upon Hudson’s request to speak to Mrs. Arey, the defendant responded, “You do not need to speak to her . . . I’m the fucking asshole . . . I’m the one who did it.” The defendant further stated that “I don’t know why I did it . . . she has been in *57 business 20 years . . . I’m the one . . . she did not do anything . . .” The court finds that these statements were spontaneous and not in response to any interrogation by Hudson. Hudson’s only question to the defendant, “(d]o you want to tell me something?,” was asked subsequent to the statements at issue. The defendant, after this question, stated his preference to remain silent pursuant to his attorney’s advice. Hudson then advised the defendant “to do what your attorney has told you to do.” The defendant asked Hudson if he was going to be arrested. Hudson responded that he believed the Billerica Police were still investigating the matter. Approximately ten minutes after his arrival, Hudson left the Areys’ home in possession of their child care license. At approximately 1:40 p.m. that afternoon, Hudson informed a Billerica police officer of his concerns regarding the emotional condition of the Areys.
RULINGS OF LAW
I.
The defendant contends that his statements to Hudson were involuntary and coerced. The defendant asserts that Hudson’s visit was part of a concerted and continuous investigation to obtain information and that the defendant’s statements were the result of psychological coercion. Further, the defendant contends that he was emotionally despondent at the time the statements were made, and therefore, the statements were not the product of “a rational intellect and free will.”
Before any admissions or confessions can be admitted into evidence, the statements must be proven to be voluntary beyond a reasonable doubt. Commonwealth v. Colon-Cmz, 408 Mass. 533, 538 (1990). In evaluating voluntariness, the court must look at the totality of the circumstances. Commonwealth v. Mahnke, 368 Mass. 662, 680 (1975), cert, denied 425 U.S. 959 (1975).
Prior to Hudson’s visit, the defendant had only been questioned by Detective Latsky.[7] Further, the court has found that the District Attorney’s Office and the Billerica Police Department did not control nor direct the investigations of either the DSS or the OFC. Thus, the defendant’s contention that Hudson’s visit was part of a concerted and continuous investigation which mentally weakened him is not persuasive.
Further, the defendant was not subject to a physical or mental impairment which prohibited his admission from being the product of rational intellect and free will. Commonwealth v. Wilburne, 382 Mass. 241 (1981). Although Hudson noted his concern over the Areys’ emotional condition upon leaving the Arey residence, emotional upheaval by itself does not render an admission involuntary. Commonwealth v. Alves, 35 Mass.App.Ct. 935, 936 (1993); see also Commonwealth v. Taylor, 389 Mass. 725, 729 (1986) (ruling subsequent confession of murder admissible where defendant sobbed uncontrollably and police suspended questioning until defendant composed himself). In the absence of any evidence to the contrary, the court concludes that the defendant’s statements to Hudson were voluntary and the product of a rational intellect. Commonwealth v. Allen, 395 Mass. 448 (1985).
II.
The defendant contends that his statements were obtained in violation of his Fifth Amendment right against self-incrimination. The defendant further asserts that, after he refused to sign Detective Laskey’s Miranda waiver form, further interrogation by any person at the District Attorney’s instruction and direction should have ceased, or should have been conducted with special care, to ensure that the defendant comprehended his rights and executed a valid waiver.
The purpose of the Miranda requirement is to ensure that an individual’s privilege against self-incrimination is not ignored by overzealous law enforcement personnel. See Miranda v. Arizona, 384 U.S. 436, 443-44 (1966). “The Miranda rule does not apply to a private citizen . . . who is acting neither as an instrument of the police nor as an agent of the police pursuant to a scheme to elicit statements from the defendant by coercion or guile.” Commonwealth v. Snyder, 413 Mass. 521, 532 (1992). As previously stated, the court has found that neither the District Attorney’s Office nor the Billerica Police Department controlled or directed the OFC’s investigation. Therefore, because the defendant’s extemporaneous statements were not the result of police questioning, Miranda does not apply and the defendant’s Fifth Amendment rights are not implicated.
Furthermore, Miranda warnings are only required when an individual is subjected to custodial interrogation. Miranda, supra at 444; Commonwealth v. Bryant, 390 Mass. 729, 736 (1984). Custody implies that a defendant did not know or assume that he was free to leave. Commonwealth v. Buckley, 410 Mass. 209, 216-17 (1991). A person is in custody only if he is under formal arrest or subject to a “restraint of freedom of movement to the degree associated with a formal arrest.” New York v. Quarles, 467 U.S. 649, 655 (1984) (citations omitted). The encounter between the defendant and Hudson took place in the defendant’s home with the defendant’s voluntary acquiescence. “Questioning in such an environment is far removed from the ‘incommunicado interrogation of individuals in a police-dominated atmosphere’ for which the Miranda protections were tailored.” Commonwealth v. Bryant, 390 Mass. 729, 737 (1984), quoting Miranda, supra at 445. Thus, the court concludes that, even assuming arguendo that Hudson was an agent of the police, the defendant was not in custody for the purposes of Miranda.
*58 III.
The defendant contends that the statements were obtained in violation of his Sixth Amendment right to counsel. The defendant asserts that, because the OFC was aware that the defendant was represented by counsel, Hudson should not have contacted or questioned the defendant without Attorney Dangora being present.
An individual’s Sixth Amendment right to counsel “attaches only at or after the time that adversary judicial proceedings have been initiated against the defendant.” Kirby u. Illinois, 406 U.S. 682, 688 (1972). Once adversary proceedings have commenced, an individual “has a right to legal representation when the government interrogates him.”[8] Commonwealth v. Smallwood, 379 Mass. 878, 884 (1980), quoting Brewer u. WUliams, 430 U.S. 387, 401 (1977).
In Massachusetts, the complaint and arrest warrant procedure does not amount to an adversary judicial proceeding, and therefore, does not implicate an individual’s right to counsel. Smallwood, supra at 885-86. The government must initiate judicial criminal proceedings by way of formal charge, preliminary hearing, indictment, information, or arraignment before an individual’s right to counsel attaches. Small-wood, supra at 884, citing Kirby at 689. Because the defendant’s statements were uttered three days prior to the issuance of a complaint, the defendant’s Sixth Amendment rights had not attached, and thus were not violated, at the time of Hudson’s visit.
ORDER
For the foregoing reasons, the defendant Louis Arey’s Motion to Suppress is DENIED.

The name is withheld from this memorandum of decision.

The defendant was a co-owner of the Arey Country Day School with his wife Barbara Arey.

Sexual Abuse Investigative Network.

The SAIN interview was originally scheduled for February 10, 1994 at the Lowell DSS office.

There was no OFC representative on the SAIN team.

Courier service on Friday was unavailable due to the snow storm and Federal Express would not have delivered the Notice of Emergency Suspension until Monday.

The DSS agent and the OFC agent were not allowed to question the defendant per Attorney Dangora’s instructions.

As stated throughout this opinion, neither Hudson nor the OFC was an agent of the District Attorney or the Billerica Police Department. However, the court will still address the defendant’s contentions concerning his Sixth Amendment right to counsel assuming arguendo that Hudson was a government agent.